UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLA R. BACKMON | : CIVIL ACTION NO.: 3:18-CV-00957-SRU |
| *Plaintiff,* | : |
| v. | : |
| JOHN D'AMELIA & ASSOCIATES, LLC et. al. | :                                      : |
| *Defendants.* | : September ___, 2018 |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Plaintiff, Carla Backmon, pro se, hereby submits her Memorandum of Law in

Opposition to Defendant's Motion to Dismiss.

I. Introduction

Plaintiff filed an affirmed four count First Amended Complaint ("Complaint") on June 25,

2018, (Dkt.# 15, pgs. 3 and 4) and over 200 pages of affirmed Exhibits to the Complaint

("Exhibits") on July 3, 2018 (Dkt# 17) and its Exhibits (Dkt# 17-1 through 17-50), alleging:

> "This action is brought by Carla R. Backmon ("Plaintiff") to enforce
> Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794
> ("Section 504"); Title II of the Americans with Disabilities Act of 1990, as
> amended, 42 U.S.C. §§ 12131-12134 ("Title II" and "ADA"); Title VIII of the
> Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of
> 1988, 42 U.S.C. §§ 3601 et seq. ("Fair Housing Act"), and their implementing
> regulations, 28 C.F.R. pts. 35, 41, and 42 subpt. G and 24 C.F.R. pts. 8 and 100;
> Section 8 (y) of the U.S. Housing Act of 1937, amended by the Quality Housing
> and Work Responsibility Act of 1998, and their implementing regulations, 24
> C.F.R. Part 982, subpts. G, H, I, and M, and 24 C.F.R. pts. 5, 8 and § 982.625 -
> 982.643 ("HCV"), against John D' Amelia and Associates ("JDA"), the Housing
> Authority of the City of Danbury ("HACD"), Beacon Communities doing
> business as Southwood Square Apartments ("BC") and The Simon Konover
> Company, Konover Residential Corporation ("KRC"), that manages the Housing
> Authority of New Canaan ("HANC"). The Plaintiff brings this action to remedy

Defendant's discrimination against individuals with disabilities, including its systematic failure to provide reasonable accommodations in response to requests from Plaintiff and its failure to properly process, decide and fulfill request for reasonable accommodations for tenants with certain disabilities. Including, but not limited to, denying HCV Homeownership Program necessary as a reasonable accommodation for a person with disabilities in accordance with 24 C.F.R. § 982.601(b)(3), 24 C.F.R. § 982.625, and in accordance with 24 C.F.R. Part 8. Denying exceptions to payment standards for persons with disabilities as a reasonable accommodation in accordance with 24 C.F.R. § 982.503(c)(2)(ii), and 24 C.F.R. § 982.505(d). Violating Federal and State health and safety codes, denying persons the right to healthy and safe housing under, 24 C.F.R. § 902.401, Housing Quality Standards, Performance Requirements, and Acceptability Criteria. Violating Connecticut's law, Conn. Gen. Stat. Ann.§§ . 47a-7, Landlord Responsibilities, 47a-12, Breech of agreement by landlord and Section 46a-20, Retaliatory action by landlord prohibited." _____ (Docket #15, pg.3 and pg. 4)

For reasons more fully detailed below all such claims are valid. And due to the Illegality of the "Release, Surrender and Termination of Lease Agreement" ("Agreement"), made by the Defendant on June 27, 2018, and the retaliatory means the Plaintiff was forced to sign on July 16, 2018, the request by the Defendant to also bar Plaintiffs' Complaint for any and all claims due to said Agreement is illegal, unenforceable, against public policy, and therefor void, and should be denied.

## I. Argument

### A. Standard of Review

A motion to dismiss under Rule 12(b)(6) is disfavored and rarely granted. *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986) ("It is axiomatic that '[t]he motion to dismiss for failure to state a claim is viewed with disfavor and is rarely granted.'") (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure 1357, at 598.

The issue is not whether the plaintiff will prevail or not. The issue is whether the plaintiff is entitled to offer evidence in support of their claims.

The U.S. Supreme Court has stated: "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence in support of the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely, but that is not the test." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). Rather, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Defendant asserts that it is unclear which of the four counts of the Complaint are specifically filed against them. Although, the Court has already found that the Complaint was clear and unambiguous on August 24, 2018 (Dkt.# 32), when defendants, Beacon Communities, LLC d/b/a Southwood Square Apartments filed a Motion for More Definite Statement. To further support this argument, Defendant alleges that all such claims are barred by a "Release, Surrender and Termination of Lease Agreement" made by the Defendant on June 27, 2018 and the retaliatory means the Plaintiff was forced to sign on July 16, 2018.

Defendants' proposition that the Court should bar the claims in the Complaint should be rejected outright. It is well established that "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss[.]" Dunn v. Castro, 621 F.3d 1196, 1205 n.6 (quoting Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)); Magulta v. Samples, 375 F.3d 1269, 1274-75 (11th Cir. 2004) (when reviewing a motion to dismiss for failure to state a claim, courts should read the complaint in its entirety); Wright & Miller, Federal Practice and Procedure § 1286 (3d ed. 2004); 5B Wright & Miller, Federal Practice and Procedure § 1357 (3d ed. 2004).

Consideration of the Complaint as a whole demonstrates that it meets the requirements

established under the Federal Rules. "A complaint must contain sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). This standard is met where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556). Here, the Complaint presents a detailed recitation of Plaintiffs' assertions that more than satisfies the pleading requirements. A review of the entire Complaint demonstrates that the Complaint in no way relies upon mere legal conclusions but contains a detailed factual account of Defendants' illegal practices which establish their liability for the violations of the Fair Housing Act, Section 504, Title II and ADA, Section 8 Housing Choice Voucher and HCV Homeownership Program.

**Defendant's Release Agreement to Bar All Claims Against The Simon Konover Company and Konover Residential Corporation Was Obtained Through Coercion, Intimidation and Retaliation Which Is Prohibited Under FHA**

The Defendants, TSKC/KC, along with HACD and JDA used Coercion, Intimidation and Retaliation to get plaintiff to sign the Agreement, that is prohibited under the FHA. See Dkt.# 17 pg. 2; Dkt.# 17-40 through 17-47.

Under the Fair Housing Act, it is unlawful for any person to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed any right under the law or because the person has aided or encouraged any person in the exercise of his rights. This prohibits retaliatory actions against persons enforcing the Fair Housing Act states:

24 CFR 100.400 - Prohibited interference, coercion or intimidation.

§ 100.400 Prohibited interference, coercion or intimidation.

(a) This subpart provides the Department's interpretation of the conduct that is unlawful under section 818 of the Fair Housing Act.

(b) It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of that person having exercised or enjoyed, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this part.

(c) Conduct made unlawful under this section includes, but is not limited to, the following:

(1) Coercing a person, either orally, in writing, or by other means, to deny or limit the benefits provided that person in connection with the sale or rental of a dwelling or in connection with a residential real estate-related transaction because of race, color, religion, sex, handicap, familial status, or national origin.

(2) Threatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the race, color, religion, sex, handicap, familial status, or national origin of such persons, or of visitors or associates of such persons.

(3) Threatening an employee or agent with dismissal or an adverse employment action, or taking such adverse employment action, for any effort to assist a person seeking access to the sale or rental of a dwelling or seeking access to any residential real estate-related transaction, because of the race, color, religion, sex, handicap, familial status, or national origin of that person or of any person associated with that person.

(4) Intimidating or threatening any person because that person is engaging in activities designed to make other persons aware of, or encouraging such other persons to exercise, rights granted or protected by this part.

(5) Retaliating against any person because that person has made a complaint, testified, assisted, or participated in any manner in a proceeding under the Fair Housing Act.

(6) Retaliating against any person because that person reported a discriminatory housing practice to a housing provider or other authority.

[ 54 FR 3283, Jan. 23, 1989, as amended at 81 FR 63075, Sept. 14, 2016]

## 8. Plaintiffs Response and Opposition to Defendants Statement of Undisputed Material Facts and Affidavit of Marie Mazzotta

Plaintiff submits the following responses to Defendants Statement of Undisputed Material

facts. The Defendant's Material Facts and the Affidavit of Marie Mazzott are disputed. The

statements in the table below are numbered to correspond to Defendants Statement of

Undisputed Material Facts (Dkt.# 36) and to the Affidavit of Marie Mazzotta (Dkt.# 36-1) ;

| ¶ Defendants Material Facts | ¶ Affidavit Marie Mazzotta | Defendants' Undisputed Material Facts and Supporting Evidence | Affidavit Marie Mazzotta | Plaintiff, the Opposing Party, Response and Supporting Evidence |
|---|---|---|---|---|
| 1 | 2 | KRC is a wholly-owned subsidiary of TSKC. See Affidavit of Marie Mazzota at ¶ 2, attached hereto as Exhibit 1. | I am the President of Konover Residential Corporation ("KRC"), which is a wholly-owned subsidiary of The Simon Konover Company ("TSKC") | Undisputed. |
| 2 | 3 | KRC provides property management services for a diverse portfolio of market rate and affordable residential communities throughout Connecticut and other states. Id. at ¶ 3. | KRC provides property management services for a diverse portfolio of market rate and affordable residential communities throughout Connecticut and other states. | Undisputed. |

| 3 | 4 | Effective January 1, 2018, KRC contracted with the Housing Authority of the Town of New Canaan d/b/a Millport Phase I Limited Partnership ("Owner") to provide property management services for the Owner's property located at 57 Millport Avenue, New Canaan, Connecticut 06840 (the "Millport Property"). Id. at ¶ 4, A true and accurate copy of the Management Agreement between KRC and the Owner regarding the Millport Property is attached hereto as Exhibit 2. Id. | Effective January 1, 2018, KRC contracted with the Housing Authority of the Town of New Canaan d/b/a Millport Phase I Limited Partnership ("Owner") to provide property management services for the Owner's property located at 57 Millport Avenue, New Canaan, Connecticut 06840 (the "Millport Property"). Id. at ¶ 4, A true and accurate copy of the Management Agreement between KRC and the Owner regarding the Millport Property is attached hereto as Exhibit 2. | Disputed. Contract states it was effective January 1, 2017 |
|---|---|---|---|---|

| 4 | 5 | On or about May 15, 2018, Plaintiff entered into an Apartment Lease Agreement ("Lease") to rent an apartment located at the Millport Property at 35 Millport Avenue, Unit #212, New Canaan, CT 06840 ("Apartment"). Id. at ¶ 5. A true and accurate copy of Plaintiff's Lease is attached hereto as Exhibit 3. Id. | On or about May 15, 2018, Carla Backmon entered into an Apartment Lease Agreement ("Lease") to rent an apartment located at the Millport Property at 35 Millport Avenue, Unit #212, New Canaan, CT 06840 ("Apartment"). A true and accurate copy of Ms. Backmon's Lease is attached hereto as Exhibit 3. | Disputed. The lease is incomplete and is missing: See Exhibit 1 and EXHIBIT 2 1) HUD HAP Contract, form HUD-5261; Part C of HAP Contract: Tenancy Addendum states under Conflict with Other Provisions of Lease, 14(a) "In case any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required addendum shall control; 2) Smoke Free Addendum; SEE DKT#36-1 EXHIBIT 3 Pg 1 3) Reasonable Accommodation Addendum |

Z DEFENDANTS DKT # 36-1 EXHIBIT 3 pg 1
"CONNECTICUT APARTMENT LEASE AGREEMENT"

EXHIBIT 1 - SAMPLE OF THE HOUSING ASSISTANCE PAYMENTS CONTRACT (HAP CONTRACT) AND REQUIRED BY FEDERAL LAW AND IS A CONTRACT THAT IS ENTERED TO PROVIDE ASSISTANCE FOR THE FAMILY UNDER THE SECTION 8 VOUCHER
EXHIBIT 2   PROGRAM (See HUD program regulations at 24 CODE OF FEDERAL REGULATION 982
- "JOINT STATEMENT OF THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT AND THE DEPARTMENT OF JUSTICE, REASONABLE ACCOMMODATIONS UNDER THE FAIR HOUSING ACT. - MAY 14-2004

8 of 26

| 5 | 6 | Pursuant to the terms of the Lease, Plaintiff agreed to rent the Apartment from May 15, 2018 through April 30, 2019. See Exhibit 1 at ¶ 6; see also Exhibit 3 at pg.2. | Pursuant to the terms of the Lease, Plaintiff agreed to rent the Apartment from May 15, 2018 through April 30, 2019. See Exhibit 3 at pg. 2. | Dispute. Although Plaintiff agreed to rent the unit, the Plaintiff did not agree to remain in a lease where the unit is unsafe and uninhabitable, defendant breaches the lease, discrimination, RA denials and retaliation. |

| 6 | 7 | Pursuant to the terms of the Lease, Plaintiff agreed to, among other things, pay rent on a monthly basis "through the Lease End Date [i.e., through April 30, 2019]." See Exhibit 1 at ¶ 7; see also Exhibit 3 at pg.2, pg. 6 at ¶ 7, pg. 10 at ¶ 21, pg.17 at ¶ 43. Plaintiff further agreed that if she failed to pay rent through April 30, 2019, she would be in default of the Lease and she would be liable for any "actual damages due to [her] breech of [the] Lease...[including payment] for [r]ent that would have accrued through the end of the Lease Term...". See Exhibit 1 at ¶ 7; Exhibit 3 at pg. 10 at ¶ 21, pg. 17 at ¶ 43. | Pursuant to the terms of the Lease, Ms. Backmon agreed to, among other things, pay rent on a monthly basis "through the Lease End Date [i.e., through April 30, 2019]." See Exhibit 3 at pg.2, pg. 6 at ¶ 7, pg. 10 at ¶ 21, pg.17 at ¶ 43. Ms. Backmon further agreed that if she failed to pay rent through April 30, 2019, she would be in default of the Lease and she would be liable for any "actual damages due to [her] breech of [the] Lease...[including payment] for [r]ent that would have accrued through the end of the Lease Term...". See Exhibit 3 at pg. 10 at ¶ 21, pg. 17 at ¶ 43. | Dispute. The Defendant breached the Lease not the Plaintiff. The Defendant Breached the contract because the unit is unsafe and uninhabitable, violating HUD HQS, FHA, Title II ADA, Section 504, The denial of Plaintiffs , RA denials and retaliation, are all in violation in Federal and State laws. SEE EXHIBIT 2 AND EXHIBIT 1 |

| 7 | 8 | On June 24, 2018, Plaintiff sent a letter to KRC alleging that she had been denied a reasonable accommodation to be release from her lease without penalty due to claimed exposure to secondhand smoke purportedly entering her Apartment. See Exhibit 1 at ¶; See also Dkt. #17-45. | On June 24, 2018, Ms. Backmon sent a letter to KRC alleging that she had been denied a reasonable accommodation to be release from her lease without penalty due to claimed exposure to secondhand smoke purportedly entering her Apartment. | Disputed. Defendant Breached the Lease, failing to respond to Plaintiffs complaints regarding a neighbor's drifting cigarette smoke that entered her apartment and caused her health problems. |

| 8 | 9 | On June 28, 2018, Christine Chadsey, Corporate Administrator and Reasonable Accommodation Administrator at KRC, sent a letter to Plaintiff offering to, among other things, allow Plaintiff to terminate the Lease early without penalty in exchange for Plaintiff's execution of a "Release, Surrender and Termination of Leave Agreement." ("Release Agreement"). See Exhibit 1 at ¶ 9; A true and accurate copy of Ms. Chadsey's June 28, 2018 letter to Plaintiff is attached hereto as Exhibit 4. Id. A true and accurate copy of the Release Agreement is attached hereto as Exhibit 5. Id.. | On June 28, 2018, Christine Chadsey, Corporate Administrator and Reasonable Accommodation Administrator at KRC, sent a letter to Ms. Backmon offering to, among other things, allow Ms. Backmon to terminate the Lease early without penalty in exchange for Ms. Backmon's execution of a "Release, Surrender and Termination of Leave Agreement." ("Release Agreement"). A true and accurate copy of Ms. Chadsey's June 28, 2018 letter to Ms. Backmon is attached hereto as Exhibit 4. A true and accurate copy of the Release Agreement is attached hereto as Exhibit 5. | Disputed. Defendant's Release Agreement Was Obtained Through Coercion, Intimidation and Retaliation Which Is Prohibited Under FHA Thus This Illegal Agreement Is Unenforceable and therefor Void Defendant, along with JDA and HACD denied her RA request, breached the contract, denied Plaintiffs RA request, ignored HUD HQS addendum and FHA, and forced the Plaintiff to sign by withholding her new units inspection and documents until she signed. |

| 9 | 10 | Pursuant to the Release Agreement, KRC agreed to, among other things, allow Plaintiff to terminate the Lease early effective July 20, 2018; waive any and all early termination fees Plaintiff would have otherwise had to pay; and release any and all claims for damages (such as for the payment of rent by Plaintiff through April 30, 2019) which KRC "ever had, now has, or which [KRC] may have had against [Plaintiff] with respect to the Lease and use of the [Apartment] by [Plaintiff] with respect to the Lease and the use of the [Apartment] by [Plaintiff]...to the date of [the Release Agreement]." See Exhibit 1 at ¶ 10; see also Exhibit 5 at ¶ ¶ 1, 2 & 5. | Pursuant to the Release Agreement, KRC agreed to, among other things, allow Ms. Backmon to terminate the Lease early effective July 20, 2018; waive any and all early termination fees Ms. Backmon would have otherwise had to pay; and release any and all claims (such as for the payment of rent by Plaintiff through April 30, 2019) which KRC "ever had, now has, or which [KRC] may have had against [Ms. Backmon] with respect to the Lease and use of the [Apartment] by [Plaintiff] with respect to the Lease and the use of the [Apartment] by [Ms. Backmon]...to the date of [the Release Agreement]." See Exhibit 5 at ¶ ¶ 1, 2 & 5. | Disputed. Defendant's Release Agreement Was Obtained Through Coercion, Intimidation and Retaliation Which Is Prohibited Under FHA Thus This Illegal Agreement Is Unenforceable and therefor Void Defendant, along with JDA and HACD denied her RA request, breached the contract, denied Plaintiffs RA request, ignored HUD HQS addendum and FHA, and forced the Plaintiff to sign by withholding her new units inspection and documents until she signed. |

| 10 | 11 | The Release Agreement was made between Plaintiff and TSKC/KRC as of June 27, 2018 and signed by Plaintiff on Plaintiff on July 16, 2018. See Exhibit 1 at ¶ 11; see also Exhibit 5. | The Release Agreement was made between Ms. Backmon and TSKC/KRC as of June 27, 2018 and signed by Ms. Backmon on July 16, 2018. See Exhibit 5. | Disputed. Defendant's Release Agreement Was Obtained Through Coercion, Intimidation and Retaliation Which Is Prohibited Under FHA Thus This Illegal Agreement Is Unenforceable and therefor Void Defendant, along with JDA and HACD denied her RA request, breached the contract, denied Plaintiffs RA request, ignored HUD HQS addendum and FHA, and forced the Plaintiff to sign by withholding her new units inspection and documents until she signed. |
| 11 | 12 | In consideration for executing the Release Agreement and receiving the benefits provided to Plaintiff therein, Plaintiff agreed, among other things, as follows:<br><br>[Plaintiff] hereby releases and discharges [KRC] | In consideration for executing the Release Agreement and receiving the benefits provided to Ms. Backmon therein, Ms. Backmon agreed, among other things, as follows:<br><br>[Ms. Backmon] hereby releases | Disputed. Defendant's Release Agreement Was Obtained Through Coercion, Intimidation and Retaliation Which Is Prohibited Under FHA Thus This Illegal Agreement Is Unenforceable and therefor Void |

| 11 | 12 | and their past and current affiliates, related entities, parents [i.e., TSKC], subsidiaries, stockholders, principals, officers, trustees, directors members, partners, insurers, employees, agents, servants, management and maintenance staffs, representatives, vendors and attorneys, and the successors, heirs, executors, and administrators of each of them, from any and all manner of actions, causes of action, suits, damages judgments, executions, claims and demands whatsoever, in law or in equity, which [Plaintiff] may have had against [KRC] for, upon or by reason of any matter, cause, or thing whatsoever from the beginning of time to the date of this [Release] Agreement, including without limiting the | and discharges [KRC] and their past and current affiliates, related entities, parents [i.e., TSKC], subsidiaries, stockholders, principals, officers, trustees, directors members, partners, insurers, employees, agents, servants, management and maintenance staffs, representatives, vendors and attorneys, and the successors, heirs, executors, and administrators of each of them, from any and all manner of actions, causes of action, suits, damages judgments, executions, claims and demands whatsoever, in law or in equity, which [Ms. Backmon] may have had against [KRC] for, upon or by reason of any matter, cause, or thing whatsoever from the beginning of time to the date of this [Release] Agreement, including without | Defendant, along with JDA and HACD denied her RA request, breached the contract, denied Plaintiffs RA request, ignored HUD HQS addendum and FHA, and forced the Plaintiff to sign by withholding her new units inspection and documents until she signed. |

| 11 | 12 | generality of the foregoing, any matter, cause or thing whatsoever arising out of related to the Lease, [Plaintiff's] use of the [Apartment], and [Plaintiff's] reasonable accommodation request, except as to the obligations set forth in this [Release] Agreement.<br><br>See Exhibit 1 at ¶ 12; see also Exhibit 5 at ¶ 6. | limiting the generality of the foregoing, any matter, cause or thing whatsoever arising out of related to the Lease, [Ms. Backmon's] use of the [Apartment], and [Ms. Backmon's] reasonable accommodation request, except as to the obligations set forth in this [Release] Agreement.<br><br>See Exhibit 1 at ¶ 12; see also Exhibit 5 at ¶ 6. | |
| | | | | |

| 12 | 13 | Upon Plaintiff's execution of the Release Agreement, Plaintiff was allowed to terminate the Lease early effective July 20, 2018 without penalty and she did not have to pay any fees and/or make any rental payments she would have otherwise had to pay or make pursuant to the Lease due to such early termination. See Exhibit 1 at ¶ 13. | Upon Ms. Backmon's execution of the Release Agreement, she was allowed to terminate the Lease early effective July 20, 2018 without penalty and she did not have to pay any fees and/or make any rental payments she would have otherwise had to pay or make pursuant to the Lease due to such early termination. | Disputed. Defendant's Release Agreement Was Obtained Through Coercion, Intimidation and Retaliation Which Is Prohibited Under FHA Thus This Illegal Agreement Is Unenforceable and therefor Void Defendant, along with JDA and HACD denied her RA request, breached the contract, denied Plaintiffs RA request, ignored HUD HQS addendum and FHA, and forced the Plaintiff to sign by withholding her new units inspection and documents until she signed. |

**Plaintiffs Statement of Undisputed Material Facts**

The following affirmed, undisputed material facts were submitted through the Plaintiff's

First Amended Complaint (Dkt.# 15) on June 25, 2018, and the affirmed Exhibits to Complaint

(Dkt.# 17) and Exhibits to Complaint (Dkt.#17, and 17-1 through 17-50).  SEE  EXHIBITS 3
                                                                    ' AFFIRMATION OF  CARLA BACKMON

1. Plaintiff, Carla Backmon, is the pro se, plaintiff in this action.

2. Plaintiff has personal knowledge of facts which bear on this motion.

3. The motion should be denied because there are many genuine material issues in dispute.

4 Plaintiff is disabled. See Dkt.# 15 pg. 3 par. 17.

5. Plaintiff is divorced, and the mother of two children.

6. Plaintiff moved to Connecticut from Colorado on or about, May 30, 2015 after porting with her

   HUD Section 8 Housing Choice Voucher to continue medical care and to be closer to family and

   friends after an accident left her permanently disabled.

7. John D' Amelia and Associates ("JDA"), the Housing Authority of the City of Danbury

   ("HACD"), Beacon Communities, LLC d/b/a Southwood Square Apartments, The Simon

   Konover Company, Konover Residential Corporation ("TSKC/KRC"),  that manages the

   Housing Authority of New Canaan ("HACN"), have all violated Federal and State laws against

   her including but not limited to discriminating against her disability, denying her right to healthy

   and  safe housing, violating Federal and State health and safety codes,   denying her reasonable

   accommodations ("RA"), breaching the lease, breaching the HUD Housing Quality Standards

   ("HQS"), and by their retaliatory actions. See Dkt.# 17; Dkt.# 17-1 through Dkt.# 17-50. SEE EXHIBIT 1 AND2

8. These three years of discriminatory treatment have been traumatizing for the Plaintiffs' and her

   two children. It has caused her great emotional distress, health problems, hospitalization,

   physical and financial loss, emotional and psychological distress, and denied her the opportunity

   the equal opportunity to use and enjoy her home. See Dkt.# 17; Dkt.# 17-1 through Dkt.# 17-50.

9. John D' Amelia and Associates, LLC ("JDA"), subcontracts Plaintiffs' voucher, and Michelle Molina, is the program supervisor. See Dkt.# 17 pg. 1; Dkt.# 17-1

10. For three years, JDA's discriminatory acts and denial of over more than nine of Plaintiffs' reasonable accommodation request, dated from on about May, 2015 to present, have left her, included but not limited to being homeless three times, with health problems, hospitalized, subjected me to unhealthy and unsafe housing and retaliatory actions forcing her to relinquish her legal rights under Federal and State law. See Dkt.# 17 pg. 1; Dkt.# 17-1 through Dkt.# 17-50, SEE EXHIBIT 1 AND 2

11. The Housing Authority of the City of Danbury ("HACD"), is subcontracted a public housing agency under JDA for Plaintiffs' voucher. Santa Rodriguez, is her case worker at HACD. HACD, in collaboration with JDA have both subjected Plaintiff to the same discriminatory actions. See Dkt.#17 pg. 1 &2; Dkt.# 17-1 through Dkt.# 17-50. SEE EXHIBIT 1+2

12. Beacon Communities, LLC d/b/a Southwood Square Apartments ("BC/SW") is the first housing unit the Plaintiff moved into on or about July 15, 2015, after being in a homeless shelter for two weeks, and because her initial RA was denied by JDA and HACD.  It was a two bedroom apartment, when she had a three bedroom voucher. See Dkt.# 17 pg. 1; Dkt.# 17-2. SEE EXHIBIT 1+2

13. BC passed the HUD HQS inspection done by Kelson Inspections, but it was clear as soon as the Plaintiff moved in that it was uninhabitable and unsafe. She notified Ray Maizo at BC right away and listed the issues, including but not limited to a rusty broken stove, secondhand smoke, mold and water damage, in the kitchen, carpeting and walls. The move from Colorado to Connecticut was now a nightmare. What was suppose to be a simple port left her in a homeless shelter. This unhealthy and unsafe apartment subsequently left her with health problems, being

hospitalized, June 28, 2016, and her children sick and traumatized. See Dkt.# 17-2, Dkt.# 17-4 through Dkt.# 17-13; Dkt.# 17-16 ; SEE EXHIBIT 1+2

14. Plaintiff called the Stamford Health inspector after, JDA and HACD approved the three bedroom unit in the same complex only for her to discover that the health and safety issues were just as bad, if not worse. Mold everywhere, bathroom and kitchen, gross stuff on the patio. This unit at BC/SW had the HUD HQS inspection by Kelson Inspection also. The Plaintiff and her children were already sick from living in the current unit. She had been given orders by her children's pediatrician to leave due to the breathing difficulties my children were having, that they had to be prescribed nebulizers. JDA, BC/SW, and HACD, continuously denied RA request she submitted to find safe and sanitary housing for her children. See Dkt.# 17-7 through Dkt.# 17-10. SEE EXHIBIT 1+2

15. On or about October 26, 2016, after multiple RA rejections, and declining health, the Plaintiff decided to complete the HCV Homeownership Program so that she could find an eligible, healthy and safe, unit to purchase instead of rent. She qualified took the course and her RA request was denied even though HACD has the HCV Homeownership Program. See Dkt.# 15 par. 23 - 27 pages 9 & 10; Dkt;# 17 pg. 1; Dkt.# 17-17 through Dkt.# 17-19.

16. On or about April 20, 2017, after many housing and RA rejections, living in unhealthy and unsafe living conditions, and almost two years later, Plaintiff found a place that JDA and HACD approved.

17. On or about, March 19, 2018 2018, the Plaintiff submitted a 30-day notice to vacate, her lease would expire on April 30, 2018. On April 12, 2018,  she submitted and RA for a unit that was safe and habitable and suitable to her needs. JDA and HACD denied the RA request. On April

30, 2018. She became homeless again. See Dkt.# 17 pg. 2; Dkt.# 17-29 through Dkt.# 17-34; Dkt.# 17-48 and 17-49.

18. The Simon Konover Company / Konover Residential Corporation ("TSKC/KRC"), manages the Housing Authority of New Canaan, Millport Phase I Limited Partnership ("HANC") or about, May15, 2018, after about two weeks of being homeless she found a place, a one bedroom apartment. JDA and HACD discriminatory and retaliatory actions have forced her to stay in housing that wasn't safe or habitable for the Plaintiff or her family. This RA request Michelle Molina at JDA was approved only after she filed a claim with HUD, and wrote an email letter the Connecticut Housing Commissioner. See Dkt.# 17 pg.2; Dkt.# 17-35 through Dkt.# 17-41.

19. About three days later after moving in, on or about May 19, 2018, thecPlaintiff notified the TSKC/KRC manager, Raul Pereles, that secondhand smoke was infiltrating her apartment through the heating and cooling system and the plumbing in the bathroom, from my neighbor next door. The smoke was so severe that my two children and she began to suffer health problems. See Dkt.# 17 pg. 2; Dkt.# 17-40 through Dkt.# 17-47. SEE EXHIBIT 1+2

20. On or about, June 12, 2018, after about a month of nothing being done to resolve the secondhand smoke in the Plaintiff's unit, it is a Smoke Free building. She submitted an RA to Raul Pereles to terminate her lease and move because nothing was being done to fix the problem. One June 13, 2018, the following day she submitted a letter from her doctor and a Notice to Vacate. One evening, she even went with her two children to speak to her neighbor where the cigarette smoke was coming from. She told the Plaintiff that other tenants smoke outside the building near her unit but that the smoke doesn't bother her because she's a smoker, and while she was speaking to the Plaintiff cigarette smoke is billowing out of her apartment into the hallway. See Dkt.# 17 pg. 2; Dkt.# 17-40 through 17-47. SEE EXHIBIT 1+2

21. On or about June 28, 2018, TSKC/KRC, JDA and HACD, illegally retaliated by sending her a "Release, Surrender and Termination of Lease Agreement" that denied her right to RA, ignoring HUD HQS, Breach of the Lease, Breach of the HUD Tenant Addendum, and ignoring Federal and state health and safety housing laws. The same day the Plaintiff returned an email refusing to sign the illegal agreement, to no avail, they retaliated. See Dkt.# 17-40 through 17-47.

22. On, July 16, 2018, after being denied Plaintiffs' RA request, she was forced to sign the illegal agreement against public policy. Because, for almost one month, SKC/KRC, JDA and HACD refused to submit the HUD housing documents and schedule the required HUD inspection at the new unit until I signed the illegal release. She risked remaining in an unhealthy and unsafe unit that was causing her health problems, losing the healthy and safe new unit, and losing her deposit she had on the new unit, so being forced against her will, she signed, on July 16, 2018. See Dkt.# 17 pg. 2; Dkt.# 17-40 through 17-47. SEE EXHIBIT 1+2, SEE FHA LAW - 24 CFR 100.400

23. Now after fighting to get out of one uninhabitable and unsafe unit, on July 20, 2018, the Plaintiff found that her new unit was uninhabitable and unsafe. Due to the New Canaan Health Department inspection and Belfor Remediation inspection she could not move in and that the unit needed to be remediated.

24. The Plaintiff was homeless for a third time for two weeks, incurring more pain and suffering, more health problems and financial loss, while her unit is being remediated.

25. JDA and HACD sent Plaintiff a report that this unit that passed HUD HQS Inspection prior to her moving in. It was conducted by JDA's inspection company Kelson Inspection, and passed.

26. Yet again she was actually in uninhabitable and unsafe unit.
On July 2, 2018, the remediation was done, and the Plaintiff and her two children, were finally able to move into the unit.

**Conclusion**

For the foregoing reasons and all the others discussed in Plaintiff's Complaint, the present

Motion to Dismiss should be denied.


Respectfully submitted the 8th day of

September, 2018.

Carla Backmon, Pro se
P.O. Box 4614
Stamford, CT 06907
(203) 424-3208


## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that she is the plaintiff in the above action,
that she has read the above Plaintiffs Memorandum of Law in Opposition to Defendants Motion
to Dismiss and the information in the Plaintiffs Memorandum of Law in Opposition to
Defendants Motion to Dismiss is true and correct. 28 U.S.C. § 1746, 18 USC § 1621

Executed at _(5) MAIN STREET, NEW CANAAN, CT_ on _SEPTEMBER 8, 2018_

Carla R. Backmon (Pro se)

<u>**CERTIFICATION OF SERVICE**</u>

I hereby certify that on the 8th day of September, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties nay access this filing through the Court's CM/ECF system.

**Lynch, Traub, Keefe, and Errante, P.C.**
Donn A. Swift, Esq. 05274
52 Trumbull Street

New Haven, CT 06510
**Counsel for:**

**John D'Amelia and Associates**
37 Brookside Road
Waterbury, CT 06708

**Szilagyi & Daly**
Frank J. Szilagyi
Tucker McWeeny
118 Oak Street
Hartford, CT 06106
**Counsel for:**

**Housing Authority of the City of Danbury**
2 Mill Ridge Road
Danbury, CT 06812

**Seiger Gfeller Laurie LLP**
Charles F. Gfeller
Shrina Faldu
West Hartford Center
977 Farmington Avr., Suite 200
West Hartford, CT 06107
**Counsel for:**

**Beacon Communities, LLC D/B/ A Southwood Square Apartments**
Two Center Plaza, Suite 700
Boston, MA 02108

**Kainen, Escalera, & McHale, P.C.**
Shel D. Myers, ct 13581
21 Oak Street, Suite 601
Hartford, CT 06106
**Counsel for:**

**The Simon Konover Company, Konover Residential Corporation D/B/A Housing Authority of New Canaan**
342 North Main Street, Suite 200
West Hartford, CT 06117

Carla Backmon, Pro se

P.O. Box 4614
Stamford, CT 06907
(203) 424-3208

EXHIBIT 1

**Housing Assistance Payments Contract**

**(HAP Contract)**

**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

OMB Approval No. 2577- 0169
(Exp. 10/31/2010)

**Privacy Act Statement.** The Department of Housing and Urban Development (HUD) is authorized to collect the information required on this form by Section 8 of the U.S. Housing Act of 1937 (42 U.S.C. 1437f). Collection of family members' names and unit address, and owner's name and payment address is mandatory. The information is used to provide Section 8 tenant-based assistance under the Housing Choice Voucher program in the form of housing assistance payments. The information also specifies what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. HUD may disclose this information to Federal, State and local agencies when relevant to civil, criminal, or regulatory investigations and prosecutions. It will not be otherwise disclosed or released outside of HUD, except as permitted or required by law. Failure to provide any of the information may result in delay or rejection of family or owner participation in the program.

---

**Instructions for use of HAP Contract**

This form of Housing Assistance Payments Contract (HAP contract) is used to provide Section 8 tenant-based assistance under the housing choice voucher program (voucher program) of the U.S. Department of Housing and Urban Development (HUD). The main regulation for this program is 24 Code of Federal Regulations Part 982.

The local voucher program is administered by a public housing agency (PHA) . The HAP contract is an agreement between the PHA and the owner of a unit occupied by an assisted family. The HAP contract has three parts:

Part A Contract information (fill-ins). See
section by section instructions. Part B
Body of contract
Part C Tenancy addendum

**Use of this form**

Use of this HAP contract is required by HUD. Modification of the HAP contract is not permitted. The HAP contract must be word-for-word in the form prescribed by HUD.
However, the PHA may choose to add the following:

>Language that prohibits the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Such a prohibition must be added to Part A of the HAP contract.

>Language that defines when the housing assistance payment by the PHA is deemed received by the owner (e.g., upon mailing by the PHA or actual receipt by the owner). Such language must be added to Part A of the HAP contract.

To prepare the HAP contract, fill in all contract information in Part A of the contract. Part A must then be executed by the owner and the PHA.

**Use for special housing types**

In addition to use for the basic Section 8 voucher program, this form must also be used for the following "special housing types" which are voucher program variants for special needs (see 24 CFR Part 982, Subpart M): (1) single room occupancy (SRO) housing; (2) congregate housing; (3) group home; (4) shared housing; and (5) manufactured home rental by a family that leases the manufactured home and space. When this form is used for a special housing type, the special housing type shall be specified in Part A of the HAP contract, as follows: "This HAP contract is used for the following special housing type under HUD regulations for the Section 8 voucher program: (Insert Name of Special Housing type)."

However, this form may not be used for the following special housing types: (1) manufactured home space rental by a family that owns the manufactured home and leases only the space; (2) cooperative housing; and (3) the homeownership option under Section 8(y) of the United States Housing Act of 1937 (42 U.S.C. 1437f(y)).

**How to fill in Part A**
Section by Section Instructions

Section 2: **Tenant**
Enter full name of tenant.

Section 3. **Contract Unit**
Enter address of unit, including apartment number, if any.

Section 4. **Household Members**
Enter full names of all PHA-approved household members. Specify if any such person is a live-in aide, which is a person approved by the PHA to reside in the unit to provide supportive services for a family member who is a person with disabilities.

Section 5. **Initial Lease Term**

Enter first date and last date of initial lease term.

The initial lease term must be for at least one year. However, the PHA may approve a shorter initial lease term if the PHA determines that:

>▪ Such shorter term would improve housing opportunities for the tenant, **and**

>▪ Such shorter term is the prevailing local market practice.

Section 6. **Initial Rent to Owner**

Enter the amount of the monthly rent to owner during the initial lease term. The PHA must determine that the rent to owner is reasonable in comparison to rent for other comparable unassisted units. During the initial lease term, the owner may not raise the rent to owner.

Section 7. **Housing Assistance Payment**

Enter the initial amount of the monthly housing assistance payment.

Section 8. **Utilities and Appliances.**
The lease and the HAP contract must specify what utilities and appliances are to be supplied by the owner, and what utilities and appliances are to be supplied by the tenant. Fill in section 8 to show who is responsible to provide or pay for utilities and appliances.

form **HUD-52641** (8/2009)
ref Handbook 7420.8

**Housing Assistance Payments Contract**
**(HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

## Part A of the HAP Contract: Contract Information

(To prepare the contract, fill out all contract information in Part A.)

1.  **Contents of Contract**
    This HAP contract has three parts:

    Part A: Contract Information

    Part B: Body of Contract Part

    C: Tenancy Addendum

2.  **Tenant**

3.  **Contract Unit**

4.  **Household**

    The following persons may reside in the unit. Other persons may not be added to the household without prior written approval of
    the owner and the PHA.

5.  **Initial Lease Term**

    The initial lease term begins on (mm/dd/yyyy): _____

    The initial lease term ends on (mm/dd/yyyy): _____

6.  **Initial Rent to Owner**
    The initial rent to owner is: $ _____
    During the initial lease term, the owner may not raise the rent to owner.

7.  **Initial Housing Assistance Payment**

    The HAP contract term commences on the first day of the initial lease term. At the beginning of the HAP contract term, the amount
    of the housing assistance payment by the PHA to the owner is $ _____ per month.
    The amount of the monthly housing assistance payment by the PHA to the owner is subject to change during the HAP contract term
    in accordance with HUD requirements.

form **HUD-52641** (8/2009)
ref Handbook 7420.8

**8.   Utilities and Appliances**

The owner shall provide or pay for the utilities and appliances indicated below by an " O". The tenant shall provide or pay for the utilities and appliances indicated below by a "T". Unless otherwise specified below, the owner shall pay for all utilities and appliances provided by the owner.

| Item | Specify fuel type | | | | Provided by | Paid by |
|------|------|------|------|------|------|------|
| Heating | ☐ Natural gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | | |
| Cooking | ☐ Natural gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | | |
| Water Heating | ☐ Natural gas | ☐ Bottle gas | ☐ Oil or Electric | ☐ Coal or Other | | |
| Other Electric | | | | | | |
| Water | | | | | | |
| Sewer | | | | | | |
| Trash Collection | | | | | | |
| Air Conditioning | | | | | | |
| Refrigerator | | | | | | |
| Range/Microwave | | | | | | |
| Other (specify) | | | | | | |

**Signatures:**
**Public Housing Agency**

Owner

Print or Type Name of PHA

Print or Type Name of Owner

Signature

Signature

Print or Type Name and Title of Signatory

Print or Type Name and Title of Signatory

Date (mm/dd/yyyy)

Date (mm/dd/yyyy)

**Mail Payments to:**

Name

Address (street, city, State, Zip)

**Housing Assistance Payments Contract**
**(HAP Contract)**
**Section 8 Tenant-Based Assistance**
**Housing Choice Voucher Program**

U.S. Department of Housing
and Urban Development
Office of Public and Indian Housing

## Part B of HAP Contract: Body of Contract

1. **Purpose**

   a.  This is a HAP contract between the PHA and the owner. The HAP contract is entered to provide assistance for the family under the Section 8 voucher program (see HUD program regulations at 24 Code of Federal Regulations Part 982).

   b.  The HAP contract only applies to the household and contract unit specified in Part A of the HAP contract.

   c.  During the HAP contract term, the PHA will pay housing assistance payments to the owner in accordance with the HAP contract.

   d.  The family will reside in the contract unit with assistance under the Section 8 voucher program. The housing assistance payments by the PHA assist the tenant to lease the contract unit from the owner for occupancy by the family.

2. **Lease of Contract Unit**

   a.  The owner has leased the contract unit to the tenant for occupancy by the family with assistance under the Section 8 voucher program.

   b.  The PHA has approved leasing of the unit in accordance with requirements of the Section 8 voucher program.

   c.  The lease for the contract unit must include word-for-word all provisions of the tenancy addendum required by HUD (Part C of the HAP contract).

   d.  The owner certifies that:

   (1)  The owner and the tenant have entered into a lease of the contract unit that includes all provisions of the tenancy addendum.

   (2)  The lease is in a standard form that is used in the locality by the owner and that is generally used for other unassisted tenants in the premises.

   (3)  The lease is consistent with State and local law.

   e.  The owner is responsible for screening the family's behavior or suitability for tenancy. The PHA is not responsible for such screening. The PHA has no liability or responsibility to the owner or other persons for the family's behavior or the family's conduct in tenancy.

3. **Maintenance, Utilities, and Other Services**

   a.  The owner must maintain the contract unit and premises in accordance with the housing quality standards (HQS).

   b.  The owner must provide all utilities needed to comply with the HQS.

   c.  If the owner does not maintain the contract unit in accordance with the HQS, or fails to provide all utilities needed to comply with the HQS, the PHA may exercise any available remedies. PHA remedies

for such breach include recovery of overpayments, suspension of housing assistance payments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contract. The PHA may not exercise such remedies against the owner because of an HQS breach for which the family is responsible, and that is not caused by the owner.

   d.  The PHA shall not make any housing assistance payments if the contract unit does not meet the HQS, unless the owner corrects the defect within the period specified by the PHA and the PHA verifies the correction. If a defect is life threatening, the owner must correct the defect within no more than 24 hours. For other defects, the owner must correct the defect within the period specified by the PHA.

   e.  The PHA may inspect the contract unit and premises at such times as the PHA determines necessary, to ensure that the unit is in accordance with the HQS.

   f.  The PHA must notify the owner of any HQS defects shown by the inspection.

   g.  The owner must provide all housing services as agreed to in the lease.

4. **Term of HAP Contract**

   a.  **Relation to lease term.** The term of the HAP contract begins on the first day of the initial term of the lease, and terminates on the last day of the term of the lease (including the initial lease term and any extensions).

   b.  When HAP contract terminates.

   (1)  The HAP contract terminates automatically if the lease is terminated by the owner or the tenant.

   (2)  The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the HAP contract terminates automatically.

   (3)  If the family moves from the contract unit, the HAP contract terminates automatically.

   (4)  The HAP contract terminates automatically 180 calendar days after the last housing assistance payment to the owner.

   (5)  The PHA may terminate the HAP contract if the PHA determines, in accordance with HUD requirements, that available program funding is not sufficient to support continued assistance for families in the program.

   (6)  The HAP contract terminates automatically upon the death of a single member household, including single member households with a live-in aide.

Page 4 of 12

form HUD-52641 (8/2009)
ref Handbook 7420.8

(7) The PHA may terminate the HAP contract if the PHA determines that the contract unit does not provide adequate space in accordance with the HQS because of an increase in family size or a change in family composition.

(8) If the family breaks up, the PHA may terminate the HAP contract, or may continue housing assistance payments on behalf of family members who remain in the contract unit.

(9) The PHA may terminate the HAP contract if the PHA determines that the unit does not meet all requirements of the HQS, or determines that the owner has otherwise breached the HAP contract.

### 5. Provision and Payment for Utilities and Appliances

a. The lease must specify what utilities are to be provided or paid by the owner or the tenant.

b. The lease must specify what appliances are to be provided or paid by the owner or the tenant.

c. Part A of the HAP contract specifies what utilities and appliances are to be provided or paid by the owner or the tenant. The lease shall be consistent with the HAP contract.

### 6. Rent to Owner: Reasonable Rent

a. During the HAP contract term, the rent to owner may at no time exceed the reasonable rent for the contract unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

b. The PHA must determine whether the rent to owner is reasonable in comparison to rent for other comparable unassisted units. To make this determination, the PHA must consider:
   (1) The location, quality, size, unit type, and age of the contract unit; and
   (2) Any amenities, housing services, maintenance and utilities provided and paid by the owner.

c. The PHA must redetermine the reasonable rent when required in accordance with HUD requirements. The PHA may redetermine the reasonable rent at any time.

d. During the HAP contract term, the rent to owner may not exceed rent charged by the owner for comparable unassisted units in the premises. The owner must give the PHA any information requested by the PHA on rents charged by the owner for other units in the premises or elsewhere.

### 7. PHA Payment to Owner

a. When paid
   (1) During the term of the HAP contract, the PHA must make monthly housing assistance payments to the owner on behalf of the family at the beginning of each month.
   (2) The PHA must pay housing assistance payments promptly when due to the owner.
   (3) If housing assistance payments are not paid promptly when due after the first two calendar months of the HAP contract term, the PHA shall pay the owner penalties if all of the following circumstances apply: (i) Such penalties are in accordance with generally accepted practices and law, as applicable in the local housing market;

governing penalties for late payment of rent by a tenant; (ii) It is the owner's practice to charge such penalties for assisted and unassisted tenants; and (iii) The owner also charges such penalties against the tenant for late payment of family rent to owner. However, the PHA shall not be obligated to pay any late payment penalty if HUD determines that late payment by the PHA is due to factors beyond the PHA's control. Moreover, the PHA shall not be obligated to pay any late payment penalty if housing assistance payments by the PHA are delayed or denied as a remedy for owner breach of the HAP contract (including any of the following PHA remedies: recovery of overpayments, suspension of housing assistance payments, abatement or reduction of housing assistance payments, termination of housing assistance payments and termination of the contract).

   (4) Housing assistance payments shall only be paid to the owner while the family is residing in the contract unit during the term of the HAP contract. The PHA shall not pay a housing assistance payment to the owner for any month after the month when the family moves out.

b. Owner compliance with HAP contract. Unless the owner has complied with all provisions of the HAP contract, the owner does not have a right to receive housing assistance payments under the HAP contract.

c. Amount of PHA payment to owner
   (1) The amount of the monthly PHA housing assistance payment to the owner shall be determined by the PHA in accordance with HUD requirements for a tenancy under the voucher program.
   (2) The amount of the PHA housing assistance payment is subject to change during the HAP contract term in accordance with HUD requirements. The PHA must notify the family and the owner of any changes in the amount of the housing assistance payment.
   (3) The housing assistance payment for the first month of the HAP contract term shall be pro-rated for a partial month.

d. Application of payment. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.

e. Limit of PHA responsibility
   (1) The PHA is only responsible for making housing assistance payments to the owner in accordance with the HAP contract and HUD requirements for a tenancy under the voucher program.
   (2) The PHA shall not pay any portion of the rent to owner in excess of the housing assistance payment. The PHA shall not pay any other claim by the owner against the family.

f. Overpayment to owner. If the PHA determines that the owner is not entitled to the housing assistance payment or any part of it, the PHA, in addition to other remedies, may deduct the amount of the overpayment from any amounts due the owner (including amounts due under any other Section 8 assistance contract).

### 8. Owner Certification

the contract unit or the premises or with implementation of the HAP contract.

### 13. Conflict of Interest

a. "Covered individual" means a person or entity who is a member of any of the following classes:

(1) Any present or former member or officer of the PHA (except a PHA commissioner who is a participant in the program);

(2) Any employee of the PHA, or any contractor, sub-contractor or agent of the PHA, who formulates policy or who influences decisions with respect to the program;

(3) Any public official, member of a governing body, or State or local legislator, who exercises functions or responsibilities with respect to the program; or

(4) Any member of the Congress of the United States.

b. A covered individual may not have any direct or indirect interest in the HAP contract or in any benefits or payments under the contract (including the interest of an immediate family member of such covered individual) while such person is a covered individual or during one year thereafter.

c. "Immediate family member" means the spouse, parent (including a stepparent), child (including a stepchild), grandparent, grandchild, sister or brother (including a stepsister or stepbrother) of any covered individual.

d. The owner certifies and is responsible for assuring that no person or entity has or will have a prohibited interest, at execution of the HAP contract, or at any time during the HAP contract term.

e. If a prohibited interest occurs, the owner shall promptly and fully disclose such interest to the PHA and HUD.

f. The conflict of interest prohibition under this section may be waived by the HUD field office for good cause.

g. No member of or delegate to the Congress of the United States or resident commissioner shall be admitted to any share or part of the HAP contract or to any benefits which may arise from it.

### 14. Assignment of the HAP Contract

a. The owner may not assign the HAP contract to a new owner without the prior written consent of the PHA.

b. If the owner requests PHA consent to assign the HAP contract to a new owner, the owner shall supply any information as required by the PHA pertinent to the proposed assignment.

c. The HAP contract may not be assigned to a new owner that is debarred, suspended or subject to a limited denial of participation under HUD regulations (see 24 Code of Federal Regulations Part 24).

d. The HAP contract may not be assigned to a new owner if HUD has prohibited such assignment because:

(1) The Federal government has instituted an administrative or judicial action against the owner or proposed new owner for violation of the Fair Housing Act or other Federal equal opportunity requirements, and such action is pending; or

(2) A court or administrative agency has determined that the owner or proposed new owner violated

the Fair Housing Act or other Federal equal opportunity requirements.

e. The HAP contract may not be assigned to a new owner if the new owner (including a principal or other interested party) is the parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the PHA has determined (and has notified the family of such determination) that approving the assignment, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities.

f. The PHA may deny approval to assign the HAP contract if the owner or proposed new owner (including a principal or other interested party):

(1) Has violated obligations under a housing assistance payments contract under Section 8;

(2) Has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program;

(3) Has engaged in any drug-related criminal activity or any violent criminal activity;

(4) Has a history or practice of non-compliance with the HQS for units leased under the Section 8 tenant-based programs, or non-compliance with applicable housing standards for units leased with project-based Section 8 assistance or for units leased under any other Federal housing program;

(5) Has a history or practice of failing to terminate tenancy of tenants assisted under any Federally assisted housing program for activity engaged in by the tenant, any member of the household, a guest or another person under the control of any member of the household that:

(a) Threatens the right to peaceful enjoyment of the premises by other residents;

(b) Threatens the health or safety of other residents, of employees of the PHA, or of owner employees or other persons engaged in management of the housing;

(c) Threatens the health or safety of, or the right to peaceful enjoyment of their residents by, persons residing in the immediate vicinity of the premises; or

(d) Is drug-related criminal activity or violent criminal activity;

(6) Has a history or practice of renting units that fail to meet State or local housing codes; or

(7) Has not paid State or local real estate taxes, fines or assessments.

g. The new owner must agree to be bound by and comply with the HAP contract. The agreement must be in writing, and in a form acceptable to the PHA. The new owner must give the PHA a copy of the executed agreement.

15.  **Foreclosure.** In the case of any foreclosure, the immediate successor in interest in the property pursuant to the foreclosure shall assume such interest subject to the lease between the prior owner and the tenant and to the HAP contract between the prior owner and the PHA for the occupied unit. This provision does not affect any State or local law that provides longer time periods or other additional protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

form HUD-52641 (8/2009)
ref Handbook 7420.8

16.  **Written Notices.** Any notice by the PHA or the owner in connection with this contract must be in writing.

17.  **Entire Agreement: Interpretation**

 a. The HAP contract contains the entire agreement between the owner and the PHA.

 b   The HAP contract shall be interpreted and implemented in accordance with all statutory requirements, and with all HUD requirements, including the HUD program regulations at 24 Code of Federal Regulations Part 982.

**Housing Assistance Payments Contract
(HAP Contract)
Section 8 Tenant-Based Assistance
Housing Choice Voucher Program**

**U.S. Department of Housing
and Urban Development**
Office of Public and Indian Housing

---

## Part C of HAP Contract: Tenancy Addendum

1. **Section 8 Voucher Program**
   a. The owner is leasing the contract unit to the tenant for occupancy by the tenant's family with assistance for a tenancy under the Section 8 housing choice voucher program (voucher program) of the United States Department of Housing and Urban Development (HUD).
   b. The owner has entered into a Housing Assistance Payments Contract (HAP contract) with the PHA under the voucher program. Under the HAP contract, the PHA will make housing assistance payments to the owner to assist the tenant in leasing the unit from the owner.

2. **Lease**
   a. The owner has given the PHA a copy of the lease, including any revisions agreed by the owner and the tenant. The owner certifies that the terms of the lease are in accordance with all provisions of the HAP contract and that the lease includes the tenancy addendum.
   b. The tenant shall have the right to enforce the tenancy addendum against the owner. If there is any conflict between the tenancy addendum and any other provisions of the lease, the language of the tenancy addendum shall control.

3. **Use of Contract Unit**
   a. During the lease term, the family will reside in the contract unit with assistance under the voucher program.
   b. The composition of the household must be approved by the PHA. The family must promptly inform the PHA of the birth, adoption or court-awarded custody of a child. Other persons may not be added to the household without prior written approval of the owner and the PHA.
   c. The contract unit may only be used for residence by the PHA-approved household members. The unit must be the family's only residence. Members of the household may engage in legal profit making activities incidental to primary use of the unit for residence by members of the family.
   d. The tenant may not sublease or let the unit.
   e. The tenant may not assign the lease or transfer the unit.

4. **Rent to Owner**
   a. The initial rent to owner may not exceed the amount approved by the PHA in accordance with HUD requirements.
   b. Changes in the rent to owner shall be determined by the provisions of the lease. However, the owner may not raise the rent during the initial term of the lease.

c. During the term of the lease (including the initial term of the lease and any extension term), the rent to owner may at no time exceed:
   (1) The reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements, or
   (2) Rent charged by the owner for comparable unassisted units in the premises.

5. **Family Payment to Owner**
   a. The family is responsible for paying the owner any portion of the rent to owner that is not covered by the PHA housing assistance payment.
   b. Each month, the PHA will make a housing assistance payment to the owner on behalf of the family in accordance with the HAP contract. The amount of the monthly housing assistance payment will be determined by the PHA in accordance with HUD requirements for a tenancy under the Section 8 voucher program.
   c. The monthly housing assistance payment shall be credited against the monthly rent to owner for the contract unit.
   d. The tenant is not responsible for paying the portion of rent to owner covered by the PHA housing assistance payment under the HAP contract between the owner and the PHA. A PHA failure to pay the housing assistance payment to the owner is not a violation of the lease. The owner may not terminate the tenancy for nonpayment of the PHA housing assistance payment.
   e. The owner may not charge or accept, from the family or from any other source, any payment for rent of the unit in addition to the rent to owner. Rent to owner includes all housing services, maintenance, utilities and appliances to be provided and paid by the owner in accordance with the lease.
   f. The owner must immediately return any excess rent payment to the tenant.

6. **Other Fees and Charges**
   a. Rent to owner does not include cost of any meals or supportive services or furniture which may be provided by the owner.
   b. The owner may not require the tenant or family members to pay charges for any meals or supportive services or furniture which may be provided by the owner. Nonpayment of any such charges is not grounds for termination of tenancy.
   c. The owner may not charge the tenant extra amounts for items customarily included in rent to owner in the locality, or provided at no additional cost to unsubsidized tenants in the premises.

7. **Maintenance, Utilities, and Other Services**
   a. **Maintenance**

---

Page 9 of 12

form **HUD-52641** (8/2009)
ref Handbook 7420.8

(1) The owner must maintain the unit and premises in accordance with the HQS.

(2) Maintenance and replacement (including redecoration) must be in accordance with the standard practice for the building concerned as established by the owner.

b. **Utilities and appliances**
   (1) The owner must provide all utilities needed to comply with the HQS.
   (2) The owner is not responsible for a breach of the HQS caused by the tenant's failure to:
      (a) Pay for any utilities that are to be paid by the tenant.
      (b) Provide and maintain any appliances that are to be provided by the tenant.

c. **Family damage.** The owner is not responsible for a breach of the HQS because of damages beyond normal wear and tear caused by any member of the household or by a guest.

d. **Housing services.** The owner must provide all housing services as agreed to in the lease.

8. **Termination of Tenancy by Owner**

a. **Requirements.** The owner may only terminate the tenancy in accordance with the lease and HUD requirements.

b. **Grounds.** During the term of the lease (the initial term of the lease or any extension term), the owner may only terminate the tenancy because of:
   (1) Serious or repeated violation of the lease;
   (2) Violation of Federal, State, or local law that imposes obligations on the tenant in connection with the occupancy or use of the unit and the premises;
   (3) Criminal activity or alcohol abuse (as provided in paragraph c); or
   (4) Other good cause (as provided in paragraph d).

c. **Criminal activity or alcohol abuse.**
   (1) The owner may terminate the tenancy during the term of the lease if any member of the household, a guest or another person under a resident's control commits any of the following types of criminal activity:
      (a) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of the premises by, other residents (including property management staff residing on the premises);
      (b) Any criminal activity that threatens the health or safety of, or the right to peaceful enjoyment of their residences by, persons residing in the immediate vicinity of the premises;
      (c) Any violent criminal activity on or near the premises; or
      (d) Any drug-related criminal activity on or near the premises.

(2) The owner may terminate the tenancy during the term of the lease if any member of the household is:
   (a) Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or that, in the case of the State of New Jersey, is a high misdemeanor; or
   (b) Violating a condition of probation or parole under Federal or State law.

(3) The owner may terminate the tenancy for criminal activity by a household member in accordance with this section if the owner determines that the household member has committed the criminal activity, regardless of whether the household member has been arrested or convicted for such activity.

(4) The owner may terminate the tenancy during the term of the lease if any member of the household has engaged in abuse of alcohol that threatens the health, safety or right to peaceful enjoyment of the premises by other residents.

d. **Other good cause for termination of tenancy**
   (1) During the initial lease term, other good cause for termination of tenancy must be something the family did or failed to do.
   (2) During the initial lease term or during any extension term, other good cause may include:
      (a) Disturbance of neighbors,
      (b) Destruction of property, or
      (c) Living or housekeeping habits that cause damage to the unit or premises.
   (3) After the initial lease term, such good cause may include:
      (a) The tenant's failure to accept the owner's offer of a new lease or revision;
      (b) The owner's desire to use the unit for personal or family use or for a purpose other than use as a residential rental unit; or
      (c) A business or economic reason for termination of the tenancy (such as sale of the property, renovation of the unit, the owner's desire to rent the unit for a higher rent).
   (5) The examples of other good cause in this paragraph do not preempt any State or local laws to the contrary.
   (6) In the case of an owner who is an immediate successor in interest pursuant to foreclosure during the term of the lease, requiring the tenant to vacate the property prior to sale shall not constitute other good cause, except that the owner may terminate the tenancy effective on the date of transfer of the unit to the owner if the owner: (a) will occupy the unit as a primary residence; and (b) has provided the tenant a notice to vacate at least 90 days before the effective date of such notice. This

provision shall not affect any State or local law that provides for longer time periods or addition protections for tenants. **This provision will sunset on December 31, 2012 unless extended by law.**

e. **Protections for Victims of Abuse.**

(1) An incident or incidents of actual or threatened domestic violence, dating violence, or stalking will not be construed as serious or repeated violations of the lease or other "good cause" for termination of the assistance, tenancy, or occupancy rights of such a victim.

(2) Criminal activity directly relating to abuse, engaged in by a member of a tenant's household or any guest or other person under the tenant's control, shall not be cause for termination of assistance, tenancy, or occupancy rights if the tenant or an immediate member of the tenant's family is the victim or threatened victim of domestic violence, dating violence, or stalking.

(3) Notwithstanding any restrictions on admission, occupancy, or terminations of occupancy or assistance, or any Federal, State or local law to the contrary, a PHA, owner or manager may "bifurcate" a lease, or otherwise remove a household member from a lease, without regard to whether a household member is a signatory to the lease, in order to evict, remove, terminate occupancy rights, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others. This action may be taken without evicting, removing, terminating assistance to, or otherwise penalizing the victim of the violence who is also a tenant or lawful occupant. Such eviction, removal, termination of occupancy rights, or termination of assistance shall be effected in accordance with the procedures prescribed by Federal, State, and local law for the termination of leases or assistance under the housing choice voucher program.

(4) Nothing in this section may be construed to limit the authority of a public housing agency, owner, or manager, when notified, to honor court orders addressing rights of access or control of the property, including civil protection orders issued to protect the victim and issued to address the distribution or possession of property among the household members in cases where a family breaks up.

(5) Nothing in this section limits any otherwise available authority of an owner or manager to evict or the public housing agency to terminate assistance to a tenant for any violation of a lease not premised on the act or acts of violence in question against the tenant or a member of the tenant's household, provided that the owner, manager, or public housing agency does not subject an individual who is or has been a victim of domestic violence, dating violence, or stalking to a

more demanding standard than other tenants in determining whether to evict or terminate.

(6) Nothing in this section may be construed to limit the authority of an owner or manager to evict, or the public housing agency to terminate assistance, to any tenant if the owner, manager, or public housing agency can demonstrate an actual and imminent threat to other tenants or those employed at or providing service to the property if the tenant is not evicted or terminated from assistance.

(7) Nothing in this section shall be construed to supersede any provision of any Federal, State, or local law that provides greater protection than this section for victims of domestic violence, dating violence, or stalking.

f. **Eviction by court action.** The owner may only evict the tenant by a court action.

g. **Owner notice of grounds**

(1) At or before the beginning of a court action to evict the tenant, the owner must give the tenant a notice that specifies the grounds for termination of tenancy. The notice may be included in or combined with any owner eviction notice.

(2) The owner must give the PHA a copy of any owner eviction notice at the same time the owner notifies the tenant.

(3) Eviction notice means a notice to vacate, or a complaint or other initial pleading used to begin an eviction action under State or local law.

9. **Lease: Relation to HAP Contract**

If the HAP contract terminates for any reason, the lease terminates automatically.

10. **PHA Termination of Assistance**

The PHA may terminate program assistance for the family for any grounds authorized in accordance with HUD requirements. If the PHA terminates program assistance for the family, the lease terminates automatically.

11. **Family Move Out**

The tenant must notify the PHA and the owner before the family moves out of the unit.

12. **Security Deposit**

a. The owner may collect a security deposit from the tenant. (However, the PHA may prohibit the owner from collecting a security deposit in excess of private market practice, or in excess of amounts charged by the owner to unassisted tenants. Any such PHA-required restriction must be specified in the HAP contract.)

b. When the family moves out of the contract unit, the owner, subject to State and local law, may use the security deposit, including any interest on the deposit, as reimbursement for any unpaid rent payable by the tenant, any damages to the unit or any other amounts that the tenant owes under the lease.

Page 11 of 12

form HUD-52641 (8/2009)
ref Handbook 7420.8

c. The owner must give the tenant a list of all items charged against the security deposit, and the amount of each item. After deducting the amount, if any, used to reimburse the owner, the owner must promptly refund the full amount of the unused balance to the tenant.

d. If the security deposit is not sufficient to cover amounts the tenant owes under the lease, the owner may collect the balance from the tenant.

### 13. Prohibition of Discrimination

In accordance with applicable equal opportunity statutes, Executive Orders, and regulations, the owner must not discriminate against any person because of race, color, religion, sex, national origin, age, familial status or disability in connection with the lease.

### 14. Conflict with Other Provisions of Lease

a. The terms of the tenancy addendum are prescribed by HUD in accordance with Federal law and regulation, as a condition for Federal assistance to the tenant and tenant's family under the Section 8 voucher program.

b. In case of any conflict between the provisions of the tenancy addendum as required by HUD, and any other provisions of the lease or any other agreement between the owner and the tenant, the requirements of the HUD-required tenancy addendum shall control.

### 15. Changes in Lease or Rent

a. The tenant and the owner may not make any change in the tenancy addendum. However, if the tenant and the owner agree to any other changes in the lease, such changes must be in writing, and the owner must immediately give the PHA a copy of such changes. The lease, including any changes, must be in accordance with the requirements of the tenancy addendum.

b. In the following cases, tenant-based assistance shall not be continued unless the PHA has approved a new tenancy in accordance with program requirements and has executed a new HAP contract with the owner:

(1) If there are any changes in lease requirements governing tenant or owner responsibilities for utilities or appliances;

(2) If there are any changes in lease provisions governing the term of the lease;

(3) If the family moves to a new unit, even if the unit is in the same building or complex.

c. PHA approval of the tenancy, and execution of a new HAP contract, are not required for agreed changes in the lease other than as specified in paragraph b.

d. The owner must notify the PHA of any changes in the amount of the rent to owner at least sixty days before any such changes go into effect, and the amount of the rent to owner following any such agreed change may not exceed the reasonable rent for the unit as most recently determined or redetermined by the PHA in accordance with HUD requirements.

### 16. Notices

Any notice under the lease by the tenant to the owner or by the owner to the tenant must be in writing.

### 17. Definitions

Contract unit. The housing unit rented by the tenant with assistance under the program.

Family. The persons who may reside in the unit with assistance under the program.

HAP contract. The housing assistance payments contract between the PHA and the owner. The PHA pays housing assistance payments to the owner in accordance with the HAP contract.

Household. The persons who may reside in the contract unit. The household consists of the family and any PHA-approved live-in aide. (A live-in aide is a person who resides in the unit to provide necessary supportive services for a member of the family who is a person with disabilities.)

Housing quality standards (HQS). The HUD minimum quality standards for housing assisted under the Section 8 tenant-based programs.

HUD. The U.S. Department of Housing and Urban Development.
HUD requirements. HUD requirements for the Section 8 program. HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives.

Lease. The written agreement between the owner and the tenant for the lease of the contract unit to the tenant. The lease includes the tenancy addendum prescribed by HUD.

PHA. Public Housing Agency.

Premises. The building or complex in which the contract unit is located, including common areas and grounds.

Program. The Section 8 housing choice voucher program.
Rent to owner. The total monthly rent payable to the owner for the contract unit. The rent to owner is the sum of the portion of rent payable by the tenant plus the PHA housing assistance payment to the owner.

Section 8. Section 8 of the United States Housing Act of 1937 (42 United States Code 1437f).

Tenant. The family member (or members) who leases the unit from the owner.

Voucher program. The Section 8 housing choice voucher program. Under this program, HUD provides funds to a PHA for rent subsidy on behalf of eligible families. The tenancy under the lease will be assisted with rent subsidy for a tenancy under the voucher program.

form HUD-52641 (8/2009)
ref Handbook 7420.8

# EXHIBIT 2

# U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT

OFFICE OF FAIR HOUSING AND EQUAL OPPORTUNITY

*Washington, D.C.*
*May 14, 2004*

**JOINT STATEMENT OF**
**THE DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
**AND THE DEPARTMENT OF JUSTICE *REASONABLE ACCOMMODATIONS UNDER THE***
***FAIR HOUSING ACT***

## Introduction

The Department of Justice ("DOJ") and the Department of Housing and Urban Development ("HUD") are jointly responsible for enforcing the federal Fair Housing Act[1] (the "Act"), which prohibits discrimination in housing on the basis of race, color, religion, sex, national origin, familial status, and disability.[2] One type of disability discrimination prohibited by the Act is the refusal to make reasonable accommodations in rules, policies, practices, or services when such accommodations may be necessary to afford a person with a disability the equal opportunity to use and enjoy a dwelling.[3] HUD and DOJ frequently respond to complaints alleging that housing providers have violated the Act by refusing reasonable accommodations to persons with disabilities. This Statement provides technical assistance regarding the rights and obligations of persons with disabilities and housing providers under the Act relating to reasonable accommodations.[4]

## Questions and Answers

### 1. What types of discrimination against persons with disabilities does the Act prohibit?

The Act prohibits housing providers from discriminating against applicants or residents because of their disability or the disability of anyone associated with them[5] and from treating persons with disabilities less favorably than others because of their disability. The Act also makes it unlawful for any person to refuse "to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford ... person(s) [with disabilities] equal opportunity to use and enjoy a dwelling."[6] The Act also prohibits housing providers from refusing residency to persons with disabilities, or placing conditions on their residency, because those persons may require reasonable accommodations. In addition, in certain circumstances, the Act requires that housing providers allow residents to make reasonable structural modifications to units and public/common areas in a dwelling when those modifications may be necessary for a person with a disability to have full enjoyment of a dwelling.[7] With certain limited exceptions (*see* response to question 2 below), the Act applies to privately and publicly owned housing, including housing subsidized by the federal government or rented through the use of Section 8 voucher assistance.

### 2. Who must comply with the Fair Housing Act's reasonable accommodation requirements?

Any person or entity engaging in prohibited conduct - *i.e.*, refusing to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford a person with a disability an equal opportunity to use and enjoy a dwelling - may be held liable unless they fall within an exception to the Act's coverage. Courts have applied the Act to individuals, corporations, associations and others involved in the provision of housing and residential lending, including property owners, housing managers, homeowners and condominium associations, lenders, real estate agents, and brokerage services. Courts have also applied the Act to state and local

governments, most often in the context of exclusionary zoning or other land-use decisions. *See e.g.,* City of Edmonds v. Oxford House, Inc., 514 U.S. 725, 729 (1995); Project Life v. Glendening, 139 F. Supp. 703, 710 (D. Md. 2001), aff'd 2002 WL 2012545 (4th Cir. 2002). Under specific exceptions to the Fair Housing Act, the reasonable accommodation requirements of the Act do not apply to a private individual owner who sells his own home so long as he (1) does not own more than three single-family homes; (2) does not use a real estate agent and does not employ any discriminatory advertising or notices; (3) has not engaged in a similar sale of a home within a 24-month period; and (4) is not in the business of selling or renting dwellings. The reasonable accommodation requirements of the Fair Housing Act also do not apply to owner-occupied buildings that have four or fewer dwelling units.

### 3. Who qualifies as a person with a disability under the Act?

The Act defines a person with a disability to include (1) individuals with a physical or mental impairment that substantially limits one or more major life activities; (2) individuals who are regarded as having such an impairment; and (3) individuals with a record of such an impairment.

The term "physical or mental impairment" includes, but is not limited to, such diseases and conditions as orthopedic, visual, speech and hearing impairments, cerebral palsy, autism, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, Human Immunodeficiency Virus infection, mental retardation, emotional illness, drug addiction (other than addiction caused by current, illegal use of a controlled substance) and alcoholism.

The term "substantially limits" suggests that the limitation is "significant" or "to a large degree."

The term "major life activity" means those activities that are of central importance to daily life, such as seeing, hearing, walking, breathing, performing manual tasks, caring for one's self, learning, and speaking.[8] This list of major life activities is not exhaustive. *See e.g.,* Bragdon v. Abbott, 524 U.S. 624, 691-92 (1998)(holding that for certain individuals reproduction is a major life activity).

### 4. Does the Act protect juvenile offenders, sex offenders, persons who illegally use controlled substances, and persons with disabilities who pose a significant danger to others?

No, juvenile offenders and sex offenders, by virtue of that status, are not persons with disabilities protected by the Act. Similarly, while the Act does protect persons who are recovering from substance abuse, it does not protect persons who are currently engaging in the current illegal use of controlled substances.[9]

Additionally, the Act does not protect an individual with a disability whose tenancy would constitute a "direct threat" to the health or safety of other individuals or result in substantial physical damage to the property of others unless the threat can be eliminated or significantly reduced by reasonable accommodation.

### 5. How can a housing provider determine if an individual poses a direct threat?

The Act does not allow for exclusion of individuals based upon fear, speculation, or stereotype about a particular disability or persons with disabilities in general. A determination that an individual poses a direct threat must rely on an individualized assessment that is based on reliable objective evidence (*e.g.,* current conduct, or a recent history of overt acts). The assessment must consider: (1) the nature, duration, and severity of the risk of injury; (2) the probability that injury will actually occur; and (3) whether there are any reasonable accommodations that will eliminate the direct threat. Consequently, in evaluating a recent history of overt acts, a provider must take into account whether the individual has received intervening treatment or medication that has eliminated the direct threat (*i.e.,* a significant risk of substantial harm). In such a situation, the provider may request that the individual document how the circumstances have changed so that he no longer poses a direct threat. A provider may also obtain satisfactory assurances that the individual will not pose a direct threat during the tenancy. The housing provider must have reliable, objective evidence that a person with a disability poses a direct threat before excluding him from housing on that basis.

**Example 1:** A housing provider requires all persons applying to rent an apartment to complete an application that includes information on the applicant's current place of residence. On her application to rent an apartment, a woman notes that she currently resides in Cambridge House. The manager of the apartment complex knows that Cambridge House is a group home for women receiving treatment for alcoholism. Based solely on that information and his personal belief that alcoholics are likely to cause disturbances and damage property, the manager rejects the applicant. The

rejection is unlawful because it is based on a generalized stereotype related to a disability rather than an individualized assessment of any threat to other persons or the property of others based on reliable, objective evidence about the applicant's recent past conduct. The housing provider may not treat this applicant differently than other applicants based on his subjective perceptions of the potential problems posed by her alcoholism by requiring additional documents, imposing different lease terms, or requiring a higher security deposit. However, the manager could have checked this applicant's references to the same extent and in the same manner as he would have checked any other applicant's references. If such a reference check revealed objective evidence showing that this applicant had posed a direct threat to persons or property in the recent past and the direct threat had not been eliminated, the manager could then have rejected the applicant based on direct threat.

**Example 2**: James X, a tenant at the Shady Oaks apartment complex, is arrested for threatening his neighbor while brandishing a baseball bat. The Shady Oaks' lease agreement contains a term prohibiting tenants from threatening violence against other residents. Shady Oaks' rental manager investigates the incident and learns that James X threatened the other resident with physical violence and had to be physically restrained by other neighbors to keep him from acting on his threat. Following Shady Oaks' standard practice of strictly enforcing its "no threats" policy, the Shady Oaks rental manager issues James X a 30-day notice to quit, which is the first step in the eviction process. James X's attorney contacts Shady Oaks' rental manager and explains that James X has a psychiatric disability that causes him to be physically violent when he stops taking his prescribed medication. Suggesting that his client will not pose a direct threat to others if proper safeguards are taken, the attorney requests that the rental manager grant James X an exception to the "no threats" policy as a reasonable accommodation based on James X's disability. The Shady Oaks rental manager need only grant the reasonable accommodation if James X's attorney can provide satisfactory assurance that James X will receive appropriate counseling and periodic medication monitoring so that he will no longer pose a direct threat during his tenancy. After consulting with James X, the attorney responds that James X is unwilling to receive counseling or submit to any type of periodic monitoring to ensure that he takes his prescribed medication. The rental manager may go forward with the eviction proceeding, since James X continues to pose a direct threat to the health or safety of other residents.

### 6. What is a "reasonable accommodation" for purposes of the Act?

A "reasonable accommodation" is a change, exception, or adjustment to a rule, policy, practice, or service that may be necessary for a person with a disability to have an equal opportunity to use and enjoy a dwelling, including public and common use spaces. Since rules, policies, practices, and services may have a different effect on persons with disabilities than on other persons, treating persons with disabilities exactly the same as others will sometimes deny them an equal opportunity to use and enjoy a dwelling. The Act makes it unlawful to refuse to make reasonable accommodations to rules, policies, practices, or services when such accommodations may be necessary to afford persons with disabilities an equal opportunity to use and enjoy a dwelling.

To show that a requested accommodation may be necessary, there must be an identifiable relationship, or nexus, between the requested accommodation and the individual's disability.

**Example 1:** A housing provider has a policy of providing unassigned parking spaces to residents. A resident with a mobility impairment, who is substantially limited in her ability to walk, requests an assigned accessible parking space close to the entrance to her unit as a reasonable accommodation. There are available parking spaces near the entrance to her unit that are accessible, but those spaces are available to all residents on a first come, first served basis. The provider must make an exception to its policy of not providing assigned parking spaces to accommodate this resident.

**Example 2:** A housing provider has a policy of requiring tenants to come to the rental office in person to pay their rent. A tenant has a mental disability that makes her afraid to leave her unit. Because of her disability, she requests that she be permitted to have a friend mail her rent payment to the rental office as a reasonable accommodation. The provider must make an exception to its payment policy to accommodate this tenant.

**Example 3:** A housing provider has a "no pets" policy. A tenant who is deaf requests that the provider allow him to keep a dog in his unit as a reasonable accommodation. The tenant explains that the dog is an assistance animal that will alert him to several sounds, including knocks at the door, sounding of the smoke detector, the telephone ringing, and

community service organization to park her car close to the tenant's unit so she can transport the tenant to the grocery store and assist him with his shopping.

## 9. What happens if providing a requested accommodation involves some costs on the part of the housing provider?

Courts have ruled that the Act may require a housing provider to grant a reasonable accommodation that involves costs, so long as the reasonable accommodation does not pose an undue financial and administrative burden and the requested accommodation does not constitute a fundamental alteration of the provider's operations. The financial resources of the provider, the cost of the reasonable accommodation, the benefits to the requester of the requested accommodation, and the availability of other, less expensive alternative accommodations that would effectively meet the applicant or resident's disability-related needs must be considered in determining whether a requested accommodation poses an undue financial and administrative burden.

## 10. What happens if no agreement can be reached through the interactive process?

A failure to reach an agreement on an accommodation request is in effect a decision by the provider not to grant the requested accommodation. If the individual who was denied an accommodation files a Fair Housing Act complaint to challenge that decision, then the agency or court receiving the complaint will review the evidence in light of applicable law and decide if the housing provider violated that law. For more information about the complaint process, see question 19 below.

## 11. May a housing provider charge an extra fee or require an additional deposit from applicants or residents with disabilities as a condition of granting a reasonable accommodation?

No. Housing providers may not require persons with disabilities to pay extra fees or deposits as a condition of receiving a reasonable accommodation.

**Example 1**: A man who is substantially limited in his ability to walk uses a motorized scooter for mobility purposes. He applies to live in an assisted living facility that has a policy prohibiting the use of motorized vehicles in buildings and elsewhere on the premises. It would be a reasonable accommodation for the facility to make an exception to this policy to permit the man to use his motorized scooter on the premises for mobility purposes. Since allowing the man to use his scooter in the buildings and elsewhere on the premises is a reasonable accommodation, the facility may not condition his use of the scooter on payment of a fee or deposit or on a requirement that he obtain liability insurance relating to the use of the scooter. However, since the Fair Housing Act does not protect any person with a disability who poses a direct threat to the person or property of others, the man must operate his motorized scooter in a responsible manner that does not pose a significant risk to the safety of other persons and does not cause damage to other persons' property. If the individual's use of the scooter causes damage to his unit or the common areas, the housing provider may charge him for the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

**Example 2**: Because of his disability, an applicant with a hearing impairment needs to keep an assistance animal in his unit as a reasonable accommodation. The housing provider may not require the applicant to pay a fee or a security deposit as a condition of allowing the applicant to keep the assistance animal. However, if a tenant's assistance animal causes damage to the applicant's unit or the common areas of the dwelling, the housing provider may charge the tenant for the cost of repairing the damage (or deduct it from the standard security deposit imposed on all tenants), if it is the provider's practice to assess tenants for any damage they cause to the premises.

## 12. When and how should an individual request an accommodation?

Under the Act, a resident or an applicant for housing makes a reasonable accommodation request whenever she makes clear to the housing provider that she is requesting an exception, change, or adjustment to a rule, policy, practice, or service because of her disability. She should explain what type of accommodation she is requesting and, if the need for the accommodation is not readily apparent or not known to the provider, explain the relationship between the requested accommodation and her disability.

An applicant or resident is not entitled to receive a reasonable accommodation unless she requests one. However, the Fair Housing Act does not require that a request be made in a particular manner or at a particular time. A person with a disability need not personally make the reasonable accommodation request; the request can be made by a family member or someone else who is acting on her behalf. An individual making a reasonable accommodation request does not need to mention the Act or use the words "reasonable accommodation." However, the requester must make the request in a manner that a reasonable person would understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability.

Although a reasonable accommodation request can be made orally or in writing, it is usually helpful for both the resident and the housing provider if the request is made in writing. This will help prevent misunderstandings regarding what is being requested, or whether the request was made. To facilitate the processing and consideration of the request, residents or prospective residents may wish to check with a housing provider in advance to determine if the provider has a preference regarding the manner in which the request is made. However, housing providers must give appropriate consideration to reasonable accommodation requests even if the requester makes the request orally or does not use the provider's preferred forms or procedures for making such requests.

**Example:** A tenant in a large apartment building makes an oral request that she be assigned a mailbox in a location that she can easily access because of a physical disability that limits her ability to reach and bend. The provider would prefer that the tenant make the accommodation request on a pre-printed form, but the tenant fails to complete the form. The provider must consider the reasonable accommodation request even though the tenant would not use the provider's designated form.

### 13. Must a housing provider adopt formal procedures for processing requests for a reasonable accommodation?

No. The Act does not require that a housing provider adopt any formal procedures for reasonable accommodation requests. However, having formal procedures may aid individuals with disabilities in making requests for reasonable accommodations and may aid housing providers in assessing those requests so that there are no misunderstandings as to the nature of the request, and, in the event of later disputes, provide records to show that the requests received proper consideration.

A provider may not refuse a request, however, because the individual making the request did not follow any formal procedures that the provider has adopted. If a provider adopts formal procedures for processing reasonable accommodation requests, the provider should ensure that the procedures, including any forms used, do not seek information that is not necessary to evaluate if a reasonable accommodation may be needed to afford a person with a disability equal opportunity to use and enjoy a dwelling. See Questions 16 - 18, which discuss the disability-related information that a provider may and may not request for the purposes of evaluating a reasonable accommodation request.

### 14. Is a housing provider obligated to provide a reasonable accommodation to a resident or applicant if an accommodation has not been requested?

No. A housing provider is only obligated to provide a reasonable accommodation to a resident or applicant if a request for the accommodation has been made. A provider has notice that a reasonable accommodation request has been made if a person, her family member, or someone acting on her behalf requests a change, exception, or adjustment to a rule, policy, practice, or service because of a disability, even if the words "reasonable accommodation" are not used as part of the request.

### 15. What if a housing provider fails to act promptly on a reasonable accommodation request?

A provider has an obligation to provide prompt responses to reasonable accommodation requests. An undue delay in responding to a reasonable accommodation request may be deemed to be a failure to provide a reasonable accommodation.

### 16. What inquiries, if any, may a housing provider make of current or potential residents regarding the existence of a disability when they have not asked for an accommodation?

Under the Fair Housing Act, it is usually unlawful for a housing provider to (1) ask if an applicant for a dwelling has a disability or if a person intending to reside in a dwelling or anyone associated with an applicant or resident has a disability, or (2) ask about the nature or severity of such persons' disabilities. Housing providers <u>may</u>, however, make the following inquiries, provided these inquiries are made of all applicants, including those with and without disabilities:

- An inquiry into an applicant's ability to meet the requirements of tenancy;
- An inquiry to determine if an applicant is a current illegal abuser or addict of a controlled substance;
- An inquiry to determine if an applicant qualifies for a dwelling legally available only to persons with a disability or to persons with a particular type of disability; and
- An inquiry to determine if an applicant qualifies for housing that is legally available on a priority basis to persons with disabilities or to persons with a particular disability.

**Example 1:** A housing provider offers accessible units to persons with disabilities needing the features of these units on a priority basis. The provider may ask applicants if they have a disability and if, in light of their disability, they will benefit from the features of the units. However, the provider may not ask applicants if they have other types of physical or mental impairments. If the applicant's disability and the need for the accessible features are not readily apparent, the provider may request reliable information/documentation of the disability-related need for an accessible unit.

**Example 2:** A housing provider operates housing that is legally limited to persons with chronic mental illness. The provider may ask applicants for information needed to determine if they have a mental disability that would qualify them for the housing. However, in this circumstance, the provider may not ask applicants if they have other types of physical or mental impairments. If it is not readily apparent that an applicant has a chronic mental disability, the provider may request reliable information/documentation of the mental disability needed to qualify for the housing.

In some instances, a provider may also request certain information about an applicant's or a resident's disability if the applicant or resident requests a reasonable accommodation. See Questions 17 and 18 below.

### 17. What kinds of information, if any, may a housing provider request from a person with an obvious or known disability who is requesting a reasonable accommodation?

A provider is entitled to obtain information that is necessary to evaluate if a requested reasonable accommodation may be necessary because of a disability. If a person's disability is obvious, or otherwise known to the provider, and if the need for the requested accommodation is also readily apparent or known, then the provider may not request any additional information about the requester's disability or the disability-related need for the accommodation.

If the requester's disability is known or readily apparent to the provider, but the need for the accommodation is not readily apparent or known, the provider may request only information that is necessary to evaluate the disability-related need for the accommodation.

**Example 1:** An applicant with an obvious mobility impairment who regularly uses a walker to move around asks her housing provider to assign her a parking space near the entrance to the building instead of a space located in another part of the parking lot. Since the physical disability (*i.e.*, difficulty walking) and the disability-related need for the requested accommodation are both readily apparent, the provider may not require the applicant to provide any additional information about her disability or the need for the requested accommodation.

**Example 2:** A rental applicant who uses a wheelchair advises a housing provider that he wishes to keep an assistance dog in his unit even though the provider has a "no pets" policy. The applicant's disability is readily apparent but the need for an assistance animal is not obvious to the provider. The housing provider may ask the applicant to provide information about the disability-related need for the dog.

**Example 3:** An applicant with an obvious vision impairment requests that the leasing agent provide assistance to her in filling out the rental application form as a reasonable accommodation because of her disability. The housing provider may not require the applicant to document the existence of her vision impairment.

### 18. If a disability is not obvious, what kinds of information may a housing provider request from the person with a disability in support of a requested accommodation?

A physician or other may voluntarily indicate the nature and severity of an individual's disability (see answer above). However, in response to a request for a reasonable accommodation, a housing provider may request reliable disability-related information that (1) is necessary to verify that the person meets the Act's definition of disability (*i.e.*, has a physical or mental impairment that substantially limits one or more major life activities), (2) describes the needed accommodation, and (3) shows the relationship between the person's disability and the need for the requested accommodation. Depending on the individual's circumstances, information verifying that the person meets the Act's definition of disability can usually be provided by the individual himself or herself (*e.g.*, proof that an individual under 65 years of age receives Supplemental Security Income or Social Security Disability Insurance benefits[(19)]

or a credible statement by the individual). A doctor or other medical professional, a peer support group, a non-medical service agency, or a reliable third party who is in a position to know about the individual's disability may also provide verification of a disability. In most cases, an individual's medical records or detailed information about the nature of a person's disability is not necessary for this inquiry.

Once a housing provider has established that a person meets the Act's definition of disability, the provider's request for documentation should seek only the information that is necessary to evaluate if the reasonable accommodation is needed because of a disability. Such information must be kept confidential and must not be shared with other persons unless they need the information to make or assess a decision to grant or deny a reasonable accommodation request or unless disclosure is required by law (*e.g.*, a court-issued subpoena requiring disclosure).

**19. If a person believes she has been unlawfully denied a reasonable accommodation, what should that person do if she wishes to challenge that denial under the Act?**

When a person with a disability believes that she has been subjected to a discriminatory housing practice, including a provider's wrongful denial of a request for reasonable accommodation, she may file a complaint with HUD within one year after the alleged denial or may file a lawsuit in federal district court within two years of the alleged denial. If a complaint is filed with HUD, HUD will investigate the complaint at no cost to the person with a disability.

There are several ways that a person may file a complaint with HUD:

- By placing a toll-free call to 1-800-669-9777 or TTY 1-800-927-9275;
- By completing the "on-line" complaint form available on the HUD internet site: www.hud.gov; or
- By mailing a completed complaint form or letter to:
  Office of Fair Housing and Equal Opportunity
  Department of Housing & Urban Development
  451 Seventh Street, S.W., Room 5204
  Washington, DC 20410-2000

  Upon request, HUD will provide printed materials in alternate formats (large print, audio tapes, or Braille) and provide complainants with assistance in reading and completing forms.

  The Civil Rights Division of the Justice Department brings lawsuits in federal courts across the country to end discriminatory practices and to seek monetary and other relief for individuals whose rights under the Fair Housing Act have been violated. The Civil Rights Division initiates lawsuits when it has reason to believe that a person or entity is involved in a "pattern or practice" of discrimination or when there has been a denial of rights to a group of persons that raises an issue of general public importance. The Division also participates as *amicus curiae* in federal court cases that raise important legal questions involving the application and/or interpretation of the Act. To alert the Justice Department to matters involving a pattern or practice of discrimination, matters involving the denial of rights to groups of persons, or lawsuits raising issues that may be appropriate for *amicus* participation, contact:

  U.S. Department of Justice
  Civil Rights Division
  Housing and Civil Enforcement Section - G St.
  950 Pennsylvania Avenue, N.W.
  Washington, DC 20530

...role of the Housing and Civil Enforcement Sections wherever it is referenced.

A HUD or Department of Justice decision not to proceed with a Fair Housing Act matter does not foreclose private plaintiffs from pursuing a private lawsuit. However, litigation can be an expensive, time-consuming, and uncertain process for all parties. HUD and the Department of Justice encourage parties to Fair Housing Act disputes to explore all reasonable alternatives to litigation, including alternative dispute resolution procedures, such as mediation. HUD attempts to conciliate all Fair Housing Act complaints. In addition, it is the Department of Justice's policy to offer prospective defendants the opportunity to engage in pre-suit settlement negotiations, except in the most unusual circumstances.

1. The Fair Housing Act is codified at 42 U.S.C. §§ 3601 - 3619.

2. The Act uses the term "handicap" instead of the term "disability." Both terms have the same legal meaning. See Bragdon v. Abbott, 524 U.S. 624, 631 (1998) (noting that definition of "disability" in the Americans with Disabilities Act is drawn almost verbatim "from the definition of 'handicap' contained in the Fair Housing Amendments Act of 1988"). This document uses the term "disability," which is more generally accepted.

3. 42 U.S.C. § 3604(f)(3)(B).

4. Housing providers that receive federal financial assistance are also subject to the requirements of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Section 504, and its implementing regulations at 24 C.F.R. Part 8, prohibit discrimination based on disability and require recipients of federal financial assistance to provide reasonable accommodations to applicants and residents with disabilities. Although Section 504 imposes greater obligations than the Fair Housing Act, (e.g., providing and paying for reasonable accommodations that involve structural modifications to units or public and common areas), the principles discussed in this Statement regarding reasonable accommodation under the Fair Housing Act generally apply to requests for reasonable accommodations to rules, policies, practices, and services under Section 504. See U.S. Department of Housing and Urban Development, Office of Public and Indian Housing, Notice PIH 2002-01(HA), Notice PIH 2002-01(HA), and "Section 504 Frequently Asked Questions." (www.hud.gov/offices/fheo/disabilities/sect504faq.cfm#anchor272118).

5. The Fair Housing Act's protection against disability discrimination covers not only home seekers with disabilities but also buyers and renters without disabilities who live or are associated with individuals with disabilities 42 U.S.C. § 3604(f)(1)(B), 42 U.S.C. § 3604(f)(1)(C), 42 U.S.C. § 3604(f)(2)(B), 42 U.S.C. § (f)(2)(C). See also H.R. Rep. 100-711 - 24 (reprinted in 1988 U.S.C.A.N. 2173, 2184-85) ("The Committee intends these provisions to prohibit not only discrimination against the primary purchaser or named lessee, but also to protect denials of housing opportunities to applicants because they have children, parents, friends, spouses, roommates, patients, subtenants or other associates who have disabilities."). Accord Preamble to Proposed HUD Rules Implementing the Fair Housing Act, 53 Fed. Reg. 45001 (Nov. 7, 1988) (citing House Report).

6. 42 U.S.C. § 3604(f)(3)(B). HUD regulations pertaining to reasonable accommodations may be found at 24 C.F.R. § 100.204.

7. This Statement does not address the principles relating to reasonable modifications. For further information see the HUD regulations at 24 C.F.R. § 100.203. This statement also does not address the additional requirements imposed on recipients of Federal financial assistance pursuant to Section 504, as explained in the Introduction.

8. The Supreme Court has questioned but has not yet ruled on whether "working" is to be considered a major life activity. See Toyota Motor Mfg. Kentucky, Inc. v. Williams, 122 S. Ct. 681, 692, 693 (2002), if it is a major activity, the Court has noted that a claimant would be required to show an inability to work in a "broad range of jobs" rather than a specific job. See Sutton v. United Airlines, Inc., 527 U.S. 470, 492 (1999).

9. See, e.g., United States v. Southern Management Corp., 955 F.2d 914, 919 (4th Cir. 1992) (discussing exclusion in 42 U.S.C. § 3602(h) for "current, illegal use of or addiction to a controlled substance")

8:18-cv-00957-SRU   Document 42-1   Filed 09/08/18   Page 48

persons who meet the definition of disability are receiving Supplemental Security Income ("SSI") or Social Security Disability Insurance ("SSDI") benefits in most cases meet the definition of disability under the Fair Housing Act, although the converse may not be true. *See e.g.,* Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 797 (1999) (noting that SSDI provides benefits to a person with a disability so severe that she is unable to do her previous work and cannot engage in any other kind of substantial gainful work whereas a person pursuing an action for disability discrimination under the Americans with Disabilities Act may state a claim that "with a reasonable accommodation" she could perform the essential functions of the job).

5/13/04 >

*Updated August 6, 2015*

---

Was this page helpful?
Yes    No

EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

CARLA R. BACKMON        : CIVIL ACTION NO.: 3:18-CV-00957-SRU

       *Plaintiff.*               :

           v.                 :

JOHN D'AMELIA & ASSOCIATES, LLC et. al.    :                          :

       *Defendants.*            :     September 8, 2018

### AFFIRMATION OF CARLA BACKMON, PLAINTIFF

Carla Backmon, affirms the following under penalty of perjury:

1. I, Carla Backmon, am the pro se, plaintiff in this action, and I respectfully submit this affirmation;

2. I have personal knowledge of facts which bear on this motion.

3. The motion should be denied because there are many genuine material issues in dispute.

4. I am disabled. See Dkt# 15 pg. 3 par. 17.

5. I am divorced, and the mother of two children.

6. I moved to Connecticut from Colorado on or about, May 30, 2015 after porting with my HUD Section 8 Housing Choice Voucher to continue medical care and to be closer to family and friends after an accident left me permanently disabled.

7. John D' Amelia and Associates ("JDA"), the Housing Authority of the City of Danbury ("HACD"), Beacon Communities, LLC d/b/a Southwood Square Apartments, The Simon Konover Company, Konover Residential Corporation ("TSKC/KRC"), that manages the Housing Authority of New Canaan ("HACN"), have all violated Federal and State laws against

me including but not limited to discriminating against my disability, denying my right to healthy and safe housing, violating Federal and State health and safety codes, denying my reasonable accommodations ("RA"), breaching the lease, breaching the HUD Housing Quality Standards ("HQS"), and by their retaliatory actions. See Dkt.# 17; Dkt.# 17-1 through Dkt.# 17-50.

8. These three years of discriminatory treatment have been traumatizing for my two children and I. It has caused me great emotional distress, health problems, hospitalization, physical and financial loss, emotional and psychological distress, and denied me the opportunity the equal opportunity to use and enjoy our home. See Dkt.# 17; Dkt.# 17-1 through Dkt.# 17-50.

9. John D' Amelia and Associates, LLC ("JDA"), subcontracts my voucher, and Michelle Molina, is the program supervisor. See Dkt.# 17 pg. 1; Dkt.# 17-1

10. For three years, JDA's discriminatory acts and denial of over more than nine of my reasonable accommodation request, dated from on about May, 2015 to present, have left me, included but not limited to being homeless three times, with health problems, hospitalized, subjected me to unhealthy and unsafe housing and retaliatory actions forcing me to relinquish my legal rights under Federal and State law. See Dkt.# 17 pg. 1; Dkt.# 17-1 through Dkt.# 17-50.

11. The Housing Authority of the City of Danbury ("HACD"), is subcontracted a public housing agency under JDA for my voucher. Santa Rodriguez, my case worker at HACD. HACD, in collaboration with JDA have both subjected me to the same discriminatory actions. See Dkt.#17 pg. 1 &2; Dkt.# 17-1 through Dkt.# 17-50.

12. Beacon Communities, LLC d/b/a Southwood Square Apartments ("BC/SW") is the first housing unit I moved into on or about July 15, 2015, after being in a homeless shelter for two weeks, and because my initial RA was denied by JDA and HACD. It was a two bedroom apartment, when I had a three bedroom voucher. See Dkt.# 17 pg. 1; Dkt.# 17-2.

13. BC passed the HUD HQS inspection done by Kelson Inspections, but it was clear as soon as moved in that it was uninhabitable and unsafe. I notified Ray Maizo at BC right away and listed the issues, including but not limited to a rusty broken stove, secondhand smoke, mold and water damage, in the kitchen, carpeting and walls. The move from Colorado to Connecticut was now a nightmare. What was suppose to be a simple port left me in a homeless shelter. This unhealthy and unsafe apartment subsequently left me with health problems, being hospitalized, June 28, 2016, and my children sick and traumatized. See Dkt.# 17-2, Dkt.# 17-4 through Dkt.# 17-13; Dkt.# 17-16

14. I called the Stamford Health inspector after, JDA and HACD approved the three bedroom unit in the same complex only for me to discover that the health and safety issues were just as bad, if not worse. Mold everywhere, bathroom and kitchen, gross stuff on the patio. This unit at BC/SW had the HUD HQS inspection by Kelson Inspection also. My children and I were already sick from living in the current unit. I had been given orders by my children's pediatrician to leave due to the breathing difficulties my children were having, that they had to be prescribed nebulizers. JDA, BC/SW, and HACD, continuously denied RA request I submitted to find safe and sanitary housing for my children. See Dkt.# 17-7 through Dkt.# 17-10.

15. On or about October 26, 2016, after multiple RA rejections, and declining health, I decided to complete the HCV Homeownership Program so that I could find an eligible, healthy and safe, unit to purchase instead of rent. I qualified took the course and my RA request was denied even though HACD has the HCV Homeownership Program. See Dkt.# 15 par. 23 - 27 pages 9 & 10; Dkt;# 17 pg. 1; Dkt.# 17-17 through Dkt.# 17-19.

16. On or about April 20, 2017, after many housing and RA rejections, living in unhealthy and unsafe living conditions, and almost two years later, I found a place that JDA and HACD approved.

17 On or about, March 19, 2018 2018, I submitted a 30-day notice to vacate, my lease would expire on April 30, 2018. On April 12, 2018, I submitted and RA for a unit that was safe and habitable and suitable to my needs. JDA and HACD denied the RA request. On April 30, 2018. I became homeless again. See Dkt.# 17 pg. 2; Dkt.# 17-29 through Dkt.# 17-34; Dkt.# 17-48 and 17-49.

18. The Simon Konover Company / Konover Residential Corporation ("TSKC/KRC"), manages the Housing Authority of New Canaan, Millport Phase I Limited Partnership ("HANC") or about, May15, 2018, after about two weeks of being homeless I found a place, a one bedroom apartment. JDA and HACD discriminatory and retaliatory actions to have forced me stay in housing that wasn't safe or habitable for me or my family. This RA request Michelle Molina at JDA was approved only after I filed a claim with HUD, and wrote an email letter the Connecticut Housing Commissioner. See Dkt.# 17 pg.2; Dkt.# 17-35 through Dkt.# 17-41.

19. About three days later after moving in, on or about May 19, 2018, I notified the TSKC/KRC manager, Raul Pereles, that secondhand smoke was infiltrating by apartment through the heating and cooling system and the plumbing in the bathroom, from my neighbor next door. The smoke was so severe that my two children and I began to suffer health problems. See Dkt.# 17 pg. 2; Dkt.# 17-40 through Dkt.# 17-47.

20. On or about, June 12, 2018, after about a month of nothing being done to resolve the secondhand smoke in my unit, it is a Smoke Free building. I submitted an RA to Raul Pereles to terminate my lease and move because nothing was being done to fix the problem. One June 13, 2018, the following day I submitted a letter from my doctor and a Notice to Vacate. One evening, I even

went with my two children to I speak to my neighbor where the cigarette smoke was coming from. She told me that other tenants smoke outside the building near her unit but that the smoke doesn't bother her because she's a smoker, and while she was speaking to me cigarette smoke is billowing out of her apartment into the hallway. See Dkt.# 17 pg. 2; Dkt.# 17-40 through 17-47.

21. On or about June 28, 2018, TSKC/KRC, JDA and HACD, illegally retaliated by sending me a "Release, Surrender and Termination of Lease Agreement" that denied my right to RA, ignoring HUD HQS, Breach of the Lease, Breach of the HUD Tenant Addendum, and ignoring Federal and state health and safety housing laws. The same day I returned an email refusing to sign the illegal agreement, to no avail, they retaliated. See Dkt.# 17-40 through 17-47.

22. On, July 16, 2018, after being denied my RA request, I was forced to sign the illegal agreement against public policy. Because, for almost one month, SKC/KRC, JDA and HACD refused to submit the HUD housing documents and schedule the required HUD inspection at the new unit until I signed the illegal release. I risked remaining in an unhealthy and unsafe unit that was causing me health problems, losing the healthy and safe new unit, and losing my deposit I had on the new unit, so being forced against my will, I signed, on July 16, 2018. See Dkt.# 17 pg. 2; Dkt.# 17-40 through 17-47.

23. Now after fighting to get out of one uninhabitable and unsafe unit, on July 20, 2018, I found that my new unit was uninhabitable and unsafe. Due to the New Canaan Health Department inspection and Belfor Remediation inspection I could not move in and that the unit needed to be remediated.

24. I was homeless for a third time for two weeks, incurring more pain and suffering, more health problems and financial loss, while my unit is being remediated.

25. JDA and HACD sent me a report that this unit that passed HUD HQS Inspection prior to me moving in. It was conducted by JDA's inspection company Kelson Inspection, and passed. Yet again I was actually in uninhabitable and unsafe unit.

26. On July 2, 2018, the remediation was done, and my two children and I, were finally able to move into the unit.

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that she is the plaintiff in the above action, that she has read the above Affirmation of Carla Backmon and the information in the Affirmation of Carla Backmon is true and correct. 28 U.S.C. § 1746, 18 USC § 1621

Executed at _151 MAIN STREET, NEW CANAAN, CT 06840_ on _SEPTEMBER 5 2018_

_____
Carla R. Backmon (Pro se )

## CERTIFICATION OF SERVICE

I hereby certify that on the 8th day of September, 2018, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.

**Lynch, Traub, Keefe, and Errante, P.C.**
Donn A. Swift, Esq. 05274
52 Trumbull Street
New Haven, CT 06510
**Counsel for:**

**John D'Amelia and Associates**
37 Brookside Road
Waterbury, CT 06708

**Szilagyi & Daly**
Frank J. Szilagyi
Tucker McWeeny
118 Oak Street
Hartford, CT 06106
**Counsel for:**

**Housing Authority of the City of Danbury**
2 Mill Ridge Road
Danbury, CT 06812

**Seiger Gfeller Laurie LLP**
Charles F. Gfeller
Shrina Faldu
West Hartford Center
977 Farmington Ave., Suite 200
West Hartford, CT 06107
**Counsel for:**

**Beacon Communities, LLC D/B/ A Southwood Square Apartments**
Two Center Plaza, Suite 700
Boston, MA 02108

**Kainen, Escalera, & McHale, P.C.**
Shel D. Myers, ct 13581
21 Oak Street, Suite 601
Hartford, CT 06106
**Counsel for:**

**The Simon Konover Company, Konover Residential Corporation D/B/A Housing Authority of New Canaan**
342 North Main Street, Suite 200
West Hartford, CT 06117

Carla Backmon, Pro se

P.O. Box 4614
Stamford, CT 06907
(203) 424-3208