# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| CARLA BACKMON,<br>    Plaintiff, | No. 3:18-cv-957 (SRU) |
| v. | |
| JOHN D'AMELIA & ASSOCIATES LLC,<br>et al.,<br>    Defendants. | |

## ORDER

Plaintiff Carla Backmon ("Backmon") had trouble finding a suitable home in Connecticut

between May 2015 and July 2018. *See generally* Third Am. Compl., Doc. No. 108, at ¶¶ 25–

107.[1]  Backmon alleges that during that time period the six Defendants[2] ("Defendants") all

engaged in discriminatory housing practices against her and her two children, who suffered

periodic homelessness and ill health as a result.  *See id.* at ¶¶ 28–29, 31, 33, 39, 43, 51, 56, 67,

80, 83, 85, 87, 105.  Backmon asserts nine causes of action based on the Fair Housing Act, 42

U.S.C. §§ 3601, *et seq.*, the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.*, state

landlord-tenant law, *see* Conn. Gen. Stat. §§ 47a-1, *et seq.*, federal law prohibiting discrimination

in programs and activities supported by federal grants, *see* 29 U.S.C. § 794, and Titles 24, 28,

and 29 of the Code of Federal Regulations.  *See id.* at ¶¶ 108–89.

---

[1] Backmon filed her initial complaint on June 7, 2018.  Compl., Doc. No. 1.  The Third Amended Complaint—drafted and docketed initially on December 4, 2018 but filed definitively on March 13, 2019—is the operative complaint.  *See* Doc. Nos. 69, 108.

[2] (1) John D'Amelia and Associates, LLC, *see* Answer, Doc. No. 85; (2) the Housing Authority of the City of Danbury, *see* Answer, Doc. No. 79; (3) BCJ Management Limited Partnership, *see* Answer, Doc. No. 77; (4) Southfield Village Limited Partnership II, *see id.*; (5) The Simon Konover Company, *see* Answer, Doc. No. 116; and (6) Konover Residential Corporation, *see id.  See also* Defs.' Joint Mot. to Enforce Settlement Agreement, Doc. No. 136, at 1; Pl.'s Mot. to Amend/Correct Name of Def., Doc. Nos. 114–15.

The parties attempted to settle this case with the assistance of Magistrate Judge Holly B. Fitzsimmons more than once. Most recently, on April 29, 2019, the parties engaged in a settlement conference ("April 29 Conference") before Judge Fitzsimmons. *See* Min. Entry, Doc. No. 124. The case was reported settled and was administratively closed, subject to reopening within 30 days. *See id.*; Order, Doc. No. 125. On May 23, Backmon moved to reopen her case. *See* Pl.'s Mot. to Reopen Case, Doc. No. 127. Since then, Backmon has filed numerous motions, most of which remain pending.[3] On June 28, the Defendants made a Joint Motion to Enforce the Settlement Agreement that they claim was reached at the April 29 Conference. *See* Defs.' Joint Motion to Enforce the Settlement Agreement ("Defs.' Joint Mot."), Doc. No. 136. That motion is the subject of this ruling.

The facts indicate that there was a meeting of the minds at the April 29 Conference. Although the agreement reached at the April 29 Conference was oral and the terms were not committed to writing until weeks later (at which time Backmon claimed to disagree with them), the parties had mutually assented to clear and unambiguous terms. Thus, the Settlement Agreement is enforceable, and the Defendants' Joint Motion to Enforce the Settlement Agreement, Doc. No. 136, is **GRANTED**.

I.     **Background**

As already mentioned, the parties attempted to settle this case before Judge Fitzsimmons more than once. On September 24, 2018, I referred the case to Judge Fitzsimmons. *See* Order, Doc. No. 50. Before holding a conference, Judge Fitzsimmons appointed Attorney Greg Kirschner ("Kirschner") as pro bono counsel for Backmon for the purpose of settlement only. *See* Order, Doc. No. 62. On November 6, Judge Fitzsimmons held an eight-hour settlement

---

[3] *See, e.g.*, Doc. Nos. 105, 127, 130, 133, 147, 148, 150, 151, 152, 156, 157, 158, 160, 165, 169.

conference, but the parties did not reach an agreement. Defs.' Joint Mot., Doc. No. 136, at 5. I held a status conference with the parties on March 13, 2019. Min. Entry, Doc. No. 106. There, I resolved numerous pending motions, and the parties agreed to attempt further settlement discussions. As described above, on April 29, Judge Fitzsimmons presided over a six-hour settlement conference. *See* Min. Entry, Doc. No. 124. The parties contest what happened at the April 29 Conference.

According to the Defendants, at the April 29 Conference the parties had a "clear meeting of the minds" and agreed on the record to a settlement of all material terms. Defs.' Joint Mot., Doc. No. 136, at 5. Backmon and Kirschner "were present for the entirety of the proceedings." *Id.* at 6. Judge Fitzsimmons "recited all of the monetary and non-monetary terms of the agreement" and "explained to Plaintiff, that counsel for the Defendants would memorialize the settlement agreement in writing" before passing it along for her approval. *Id.* "Plaintiff voiced her acceptance and agreement with all terms of the settlement agreement and proceeded to thank the Court and counsel for all Defendants for their work in settling the matter." *Id.* at 6–7. There was "absolutely no ambiguity in what the parties agreed to." *Id.* at 5. The Defendants explain that it is "undisputed" that Judge Fitzsimmons canvased Backmon regarding the agreed-upon material terms; that Backmon was at all times "able to consult with, and seek counsel from" Kirschner; and that there was "no question" that all the parties agreed to the material terms of the settlement "in the presence of Judge Fitzsimmons." *Id.* at 9. Thus, Judge Fitzsimmons "stated unambiguously that the matter was settled" and that defendants would simply "memorialize the agreement in writing." *Id.* Put simply, the Defendants claim that the parties agreed that the Defendants would pay a global settlement of $62,000—with each defendant contributing a specific amount—and, in exchange, Backmon would voluntarily dismiss the case in its

entirely—including any claims by her two minor children—with prejudice. *Id.* at 4–6; *see also* Pl.'s Am. Mem. in Opp'n, Doc. No. 149-1, at 2–9. The Defendants also claim that the parties agreed on numerous non-monetary terms. *See* Defs.' Joint Mot., Doc. No. 136, at 6.[4]

Backmon claims a different view of the April 29 Conference. Backmon explains that "some material terms" were "discussed," but that an agreement was "contingent upon a draft agreement being produced and signed within thirty days." Pl.'s Mem. in Opp'n, Doc. No. 138, at 7. Backmon further claims that at the April 29 Conference Judge Fitzsimmons "recited Plaintiff counter offers and stated that a settlement agreement would be drafted for Plaintiffs review, the parties had 30-days to comply." *Id.* at 8. Backmon additionally asserts that the "parties did not agree to all the material terms, and were unclear and ambiguous with respect to a final settlement of this matter." *Id.* at 7. Backmon claims that she requested various terms at the April 29 Conference, some (but not all) of which comport with the Defendants' claims. *See id.* at 7–8.[5]

Clearly, Judge Fitzsimmons believed that the matter had been settled at the April 29 Conference because on April 30 a minute entry was filed on the docket and stated: "This case is reported settled." Min. Entry, Doc. No. 124. On May 1, an order was filed that read as follows:

> This case has been reported settled. Rather than keeping it open on the docket, the Clerk is directed to administratively close the file without prejudice to reopening within 30 days of this order. If the parties wish to file a stipulation of dismissal (for approval by the court or simply for

---

[4] Those include: payment within 30 days of receipt of a signed settlement agreement; compliance with certain Housing Quality Standards regulations; proof of fair housing training and compliance—with an emphasis on reasonable accommodations—to be proved by a certificate of completion; training on unit inspections; Backmon's admission into the home ownership program (when it opened); confidentiality; and continued court jurisdiction for two years to enforce the settlement agreement.

[5] Those include, in Backmon's words: "Homeownership Voucher – 42 CFR Part 982; Injunction – Enforce the FHA and HUD HQS Housing Laws 24 CFR 962; Federal Court Jurisdiction through Court Order to Enforce Settlement Terms and Compliance; Confidentiality Agreement; TRO against John D'Amelia and Associates, due to four months of rent arrears and lease renewal not being processed; Compensation for my out of pocket expenses, future medical, pain and suffering, humiliation, emotional distress, and deprivation of rights. Requesting payment early May, 2019; Motioned the court to appoint counsel for Discovery and Trial for Plaintiff and my Children."

inclusion in the court's file), they may do so within 30 days of this order. The dates set forth in this order may be extended for good cause pursuant to a motion filed in accordance with Local Rule 7.

Order, Doc. No. 125.

Backmon was upset with the minute entry and the order.[6]  After receiving notice of the administrative closure of her case, *see* Order, Doc. No. 125, Backmon "immediately" emailed the court and Kirschner "opposing case closure and refusing to be bound by the agreement in the absence of a signed writing." Pl.'s Mem. in Opp'n, Doc. No. 138, at 8.  On May 1, Backmon emailed both Kirschner and the court to ask: "Why are they closing my case before an agreement has been physically signed?  It's all verbal nothing is signed, I did not, nor do I agree to my case being closed before a signed agreement is in place." Pl.'s Mem. in Opp'n, Doc. No. 138-1, at 2. Kirschner emailed back to assure Backmon that this was "standard [] procedure" for cases that have "achieved a settlement in princip[le]." *Id.*  Backmon replied and explained that she was concerned about the thirty-day deadline for receiving a draft agreement possibly being pushed back from May 29 to May 31.  *See id.*  Backmon also explained that she would prefer Kirschner—rather than the Defendants—to draft the agreement.  *See id.*  Backmon continued: "I would like an agreement drafted, specific to what was agreed to during the settlement and nothing more."  *Id.*

On May 2, Backmon again emailed Kirschner and the court to say she was "really uncomfortable" with the order stating the case was settled "when it is not" and emphasized that "[u]ntil an agreement is drafted, signed, and an agreement fulfilled my case has NOT been Settled and should not be Administratively Closed."  *Id.* at 3.

---

[6] Much of the following is known because in multiple submissions Backmon has included email communications that she has had with Kirschner and the court.  *See* Pl.'s Mot. to Amend/Correct Mot. to Reopen Case, Doc. No. 130; Pl.'s Mem. in Opp'n, Doc. No. 138; Pl.'s Am. Mem. in Opp'n, Doc. No. 149.

On May 23, Kirschner and Backmon filed two seemingly conflicting motions. Kirschner filed a consent motion for leave to extend the time to move to reopen past 30 days, until June 14. Consent Mot. for Extension of Time, Doc. No. 126. Kirschner stated that "[t]he parties need additional time to finalize and execute the settlement agreement." *Id.* I granted that consent motion on May 24. Order, Doc. No. 128. Also on May 23, though, Backmon submitted a motion to re-calendar her case. Pl.'s Mot. to Reopen Case, Doc. No. 127. That motion is still pending. In that motion, Backmon focused on the Defendants' failure to "timely submit[] the Settlement Agreement." *Id.* at ¶¶ 3, 5–6.

On May 24, the Defendants emailed Kirschner a copy of the settlement agreement that they had drafted. *See* Defs.' Joint Mot., Doc. No. 136, at 7. Kirschner passed on the copy to Backmon and wrote: "I read it; it seems pretty standard; there are a few wording changes I will propose to you next week (as well as addressing the language you want added relating to damages)." Pl.'s Am. Mem. in Opp'n, Doc. No. 149-1, at 1.

On May 28, Backmon moved to amend her motion to re-calendar her case. *See* Pl.'s Mot. to Amend/Correct Mot. to Reopen Case, Doc. No. 130. That motion is still pending. Backmon had now seen the Defendants' draft settlement agreement reduced to writing. Backmon explained that "the agreement is unconscionable . . . extremely unjust, overwhelmingly one-sided, the situation has unexpectedly and drastically changed such that it is no longer fair or appropriate to enforce the agreement written." *Id.* at ¶ 1. Backmon further noted that there "has been material change in circumstances, the settlement agreement and relief sought through the settlement agreement failed to be successfully obtained in a timely matter for Plaintiff and Pro Bono attorney to review." *Id.* at ¶ 8.

The Defendants report that on June 4, Kirschner indicated he would return the draft with edits on June 5, but he failed to do so. Defs.' Joint Mot., Doc. No. 136, at 7. On June 10, the parties had a telephonic conference with Judge Fitzsimmons regarding the draft settlement agreement. Min. Entry, Doc. No. 131. The following day, Judge Fitzsimmons ordered a new schedule for executing the settlement agreement in which Kirschner would deliver the next copy of the draft settlement agreement to both Backmon and the Defendants by June 21. Order, Doc. No. 132. But on June 14, Backmon moved for Kirschner to withdraw.[7] Pl.'s Mot. for Att'y to Withdraw, Doc. No. 134. On June 16, Backmon herself sent the Defendants a "revised settlement agreement." Defs.' Joint Mot., Doc. No. 136, at 7; Pl.'s Am. Mem. in Opp'n, Doc. No. 149-1, at 10–20. The Defendants and Backmon have differing views on Backmon's revisions.

In Backmon's view, her revisions "address[] my concerns" and "express that I do not intend to be bound unless and until a formal agreement is memorialized and executed." Pl.'s Am. Mem. in Opp'n, Doc. No. 149-1, at 10. Backmon characterized her reply as an "edit" in which she "made changes to the Defendants draft of the settlement agreement so that material terms would be clear and unambiguous." Pl.'s Mem. in Opp'n, Doc. No. 138, at 9–10.[8]

In the Defendants' view, though, Backmon had "unilaterally converted" numerous material terms. The deal that the Defendants thought was clear—$62,000 for a total release of claims—had been changed. Backmon had tripled the amount of monetary compensation that she

---

[7] I granted that motion on July 29. *See* Order, Doc. No. 143.

[8] Backmon relayed those changes as follows: "Payments and Taxes[;] Payment for Personal injury only[;] Children's claim[;] Limited Release[;] Settlement amount for a general release if all other claims and[;] Including children's claims if settlement amount multiplied f0r three of us[;] Breach of Contract and Liquidated Damages[;] Defendants adding Defendants not in complaint[;] Time frame for completing housing training[;] Provision stating certain claims are not waived[;] Portability and option to terminate lease due to continued harassment and retaliation by Defendants and the damages to Plaintiff and family; HCV Homeownership Program and Portability, is not an acknowledgment but under federal law is Plaintiff's right; Court Order Retaining Jurisdiction, not just stipulated in the settlement agreement[.]"

would be owed under the agreement to $186,000[9] and converted her general release of claims into a limited release. Defs.' Joint Mot., Doc. No. 136, at 7; Pl.'s Am. Mem. in Opp'n, Doc. No. 149-1, at 10–20. The Defendants summarized other changes to material terms, too. *See* Defs.' Joint Mot., Doc. No. 136, at 7–8.[10]

Receipt of Backmon's revisions halted forward progress. On June 20, Judge Fitzsimmons held a telephonic settlement conference. Min. Entry, Doc. No. 135. No resolution was reached, and on June 28 the Defendants filed their Joint Motion to Enforce Settlement Agreement. Defs.' Joint Mot., Doc. No. 136. Backmon responded with a Memorandum in Opposition—Pl.'s Mem. in Opp'n, Doc. No. 138—and an Amended Memorandum in Opposition—Pl.'s Am. Mem. in Opp'n, Doc. No. 149.

## II. Discussion

Under Connecticut[11] and federal law, a contract of settlement is binding if the parties mutually assent to its terms, even if the agreement is not signed. *See Omega Eng'g, Inc. v.*

---

[9] Backmon has two minor children whom she has been trying to add to the case. *See, e.g.*, Motion to Amend Amended Complaint (Fourth), Doc. No. 133; Motion to Amend Amended Complaint (Fifth), Doc. No. 147.

[10] According to the Defendants, Backmon had added paragraphs, provisions or language stating that: the Defendants had committed violations and discriminated against Backmon; Backmon was entitled to more than she was settling for; the Defendants would be required to pay Backmon within five days (was 30) of receipt of the signed settlement agreement; the Defendants would be required not to file a 1099 because the settlement proceeds would be non-taxable; Backmon did not waive certain claims; liquidated damages (in the event of the Defendants' breach) would be twice the amount of the global settlement; Backmon intended to request lease termination, which must be treated as a reasonable accommodation to be completed in five days; fair housing training must be completed within the next 12 months. The Defendants also claimed that Backmon had eliminated: language regarding payment instructions; language stating that breaching confidentiality would be a material breach of the settlement agreement; the attorneys' fees provision for bad faith; an acknowledgment as to how the Home Ownership Program works.

[11] The parties seem implicitly to agree that Connecticut law governs here. The court's jurisdiction over this case is based on federal law. Other federal courts considering whether to enforce settlement agreements regarding federal claims have, indeed, applied state contract law. *See, e.g.*, *United States v. Prevezon Holdings, Ltd.*, 289 F. Supp. 3d 446, 450–51 (S.D.N.Y. 2018) ("Although the Second Circuit has not definitively ruled on whether state-law principles apply to a federal court's interpretation of federal settlement agreements, a number of district court cases examining this question have concluded that such disputes are quintessentially of contractual interpretation and wholly governed by state law.") (citing *Elliot v. City of N.Y.*, 2013 WL 3479519, at *2 (S.D.N.Y. July 10, 2013); *Brown v. City of N.Y.*, 2012 WL 628496, at *2 (E.D.N.Y. Jan. 30, 2012); *Powell v. Omnicom*, 497 F.3d 124, 129 n.1 (2d Cir. 2007)). In *Brown*, an Eastern District of New York court concluded that, not least because of the general similarity between federal and New York state contract law, "[i]n practice . . . the circuit court and various district courts regularly apply New York law in analyzing whether a settlement agreement should be enforced, even in

*Omega, S.A.*, 432 F.3d 437, 444 (2d Cir. 2005) (citing, *inter alia, Schwarzschild v. Martin*, 191 Conn. 316, 321–22 (1983); *Millgard Corp. v. White Oak Corp.*, 224 F. Supp. 2d 425, 432 (D. Conn. 2002) (applying the Connecticut rule to settlement agreements); *Role v. Eureka Lodge No. 434, I.A. of M & A.W. AFL–CIO*, 402 F.3d 314, 318 (2d Cir. 2005) ("[A] voluntary, clear, explicit, and unqualified stipulation of dismissal entered into by the parties in court and on the record is enforceable even if the agreement is never reduced to writing, signed, or filed.")). "That the agreement contemplates a subsequent written formalization is . . . insufficient to demonstrate that an oral agreement was not already reached." *ValleCastro v. Tobin, Melien & Marohn*, 2017 WL 2945717, at *4 (D. Conn. July 10, 2017) (citing *Montgomery v. Smith*, 40 Conn. Supp. 358, 359 (Super. Ct. 1985); *Hunt v. Fuksman*, 189 F.3d 461, 461 (2d Cir. 1999); *Vincent v. Hull*, 2012 WL 12883961, at *3 (D. Conn. Dec. 11, 2012), *report and recommendation adopted*, 2013 WL 12123975 (D. Conn. Jan. 23, 2013)). Such a binding agreement differs from an unenforceable "agreement to agree," which contemplates further clarification of or negotiation over terms. *See Realty Resources Chartered v. The HB Nitkin Group*, 2009 WL 2243695, at *7 (D. Conn. July 24, 2009) (citing *Kulick v. City of Hartford*, 2007 WL 4707809, at *2 (Conn. Super. Ct. Dec. 10, 2007)). An oral settlement agreement "remains binding even if a party has a change of heart between the time he agreed to the settlement and the time those terms are reduced to writing." *Powell v. Omnicom*, 497 F.3d 124, 129 (2d Cir. 2007). Connecticut courts have repeatedly noted that where there is mutual assent to clear and unambiguous terms, "the fact that an oral agreement was later to be memorialized in

---

federal-question cases." 2012 WL 628496, at *2, *report and recommendation adopted*, 2012 WL 626395 (E.D.N.Y. Feb. 27, 2012) (internal quotation marks and citation omitted). The same reasoning applies here to suggest that Connecticut law should indeed govern in the present case.

writing does not make it any less enforceable." *Ackerman v. Sobol Family P'ship, LLP*, 298 Conn. 495, 529 (2010) (collecting cases).

"A trial court has inherent power to enforce summarily a settlement agreement when the terms of the agreement are 'clear and unambiguous.'" *ValleCastro*, 2017 WL 2945717, at *3 (quoting *Audubon Parking Assocs. Ltd. P'ship v. Barclay & Stubbs, Inc.*, 225 Conn. 804, 811 (1993)). With respect to whether mutual assent has been shown, "[t]he Connecticut Supreme Court has held that '[a] contract is not made so long as, in the contemplation of the parties, something remains to be done to establish the contractual relation.'" *Omega Eng'g*, 432 F.3d at 444 (quoting *Klein v. Chatfield*, 166 Conn. 76, 80 (1974)). "The parties' intent is determined from the (1) language used, (2) circumstances surrounding the transaction, including the motives of the parties, and (3) purposes which they sought to accomplish." *Id.* (citing *Klein*).

"A district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it." *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974). "Summary enforcement is not only essential to the efficient use of judicial resources, but also preserves the integrity of settlement as a meaningful way to resolve legal disputes." *Brown v. Nationscredit Commercial*, 2000 WL 888507, at *1 (D. Conn. June 23, 2000) (citing *Audobon Parking*, 225 Conn. at 812). When a case properly before a district court is dismissed, the district court does not automatically retain jurisdiction to enforce a settlement agreement reached in the case. *See Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 381–82 (1994); *Medacist Solutions Group, LLC v. Pandora Data Systems, Inc.*, 2011 WL 13228179 (D. Conn. Feb. 22, 2011), *report and recommendation adopted*, 2011 WL 13228391 (D. Conn., Apr. 26, 2011). That is because settlement agreements are fundamentally contracts, disputes over which are properly resolved in state courts. *See Kokkonen*, 511 U.S. at 381–82.

But when a case is properly pending before a district court, the district court's authority to enforce a valid settlement agreement in that case is "essential." *Brown*, 2000 WL 888507, at *1.

The Defendants argue that Backmon should be bound to the settlement agreement reached at the April 29 Conference because it was a valid oral contract. The Defendants point out that the terms of the agreement were "unambiguous" and were reached "in front of the Court at a settlement conference, and Judge Fitzsimmons specifically confirmed Ms. Backmon's understanding and acceptance of the deal." Defs.' Joint Mot., Doc. No. 136, at 10. The Defendants argue that Backmon's "'change of heart' is an insufficient basis" to scrap the agreement. *Id.* (citing *Colapietro v. Dep't of Motor Vehicles Connecticut*, 2011 WL 3349842, at *5 (D. Conn. Aug. 3, 2011); *White v. Branchini*, 1996 WL 176380, at *1 (Conn. Super. Ct. Mar. 1, 1996)).

Backmon replies first that I do not have jurisdiction over the case and so I cannot enforce the settlement agreement. *See* Pl.'s Mot. to Dismiss for Lack of Jurisdiction Defs.' Mot. to Enforce Settlement Agreement ("Pl.'s Juris. Mot."), Doc. No. 157. Backmon next argues that, on the merits, enforcing an agreement from the April 29 Conference would be invalid for six reasons: (1) the parties did not agree to all material terms; (2) doing so would violate Connecticut's Statute of Frauds; (3) she moved to recalendar the case within thirty days of the order administratively closing her case; (4) the agreement's substance violates state and federal law, such as HUD regulations; (5) the agreement interferes with the enjoyment of Backmon's rights under the Fair Housing Act; and (6) Backmon was legally unable to include her minor children's potential claims. *See* Pl.'s Mem. in Opp'n, Doc. No. 138, at 1–2; Pl.'s Am. Mem. in Opp'n, Doc. No. 149, at 1–2. Backmon's most relevant arguments are (1) that not all material terms were agreed at the April 29 Conference and (2) (generalized from Backmon's Statute of

Frauds argument) that the absence of a signed writing here makes the oral settlement agreement unenforceable. As explained above, though, under Connecticut law, a signed writing is not necessary to enforce an oral contract to settle a lawsuit if the parties mutually assented to the oral contract's terms. *See, e.g.*, *Omega Eng'g*, 432 F.3d at 444. Thus, the only questions to address are (1) whether I have subject-matter jurisdiction over the case such that I can enforce the settlement agreement, and (2) whether the parties mutually assented to clear and unambiguous terms at the April 29 Conference.

1. *I have subject-matter jurisdiction to enforce the settlement agreement.*

Backmon argues that I cannot enforce the settlement agreement that the Defendants want me to enforce because I no longer enjoy subject-matter jurisdiction over this case. *See* Pl.'s Juris. Mot., Doc. No. 157. Backmon concedes that I *had* jurisdiction over her case pursuant to federal question jurisdiction but contends that subject-matter jurisdiction was destroyed on May 1, when "the court gave a dismissal." *Id.* at 2. Even if the case was not technically dismissed, Backmon argues, it was administratively closed, which can function as a dismissal that might terminate subject-matter jurisdiction. *Id.* at 7 (citing *Morris v. City of Hobart*, 39 F.3d 1105, 1108 (10th Cir. 1994)). As such, Backmon argues, I cannot entertain a dispute regarding the settlement agreement, which is simply a contract. *See id.* at 2–3. The Defendants have not responded to Backmon's argument.

The only question here is whether Backmon's case has been dismissed. When a case properly before a district court is dismissed, the district court does not automatically retain jurisdiction to enforce a settlement agreement reached in the case. *See Kokkonen*, 511 U.S. at 381–82. If the case has not been dismissed, then the case is properly pending before the district court, and the court has the authority to enforce a valid settlement agreement. *Brown*, 2000 WL

888507, at *1.  Some courts have held that an administrative order that closes a case without prejudice to reopening upon the occurrence of a certain action by a certain date can ripen into a dismissal upon the non-occurrence of that action, even without entry of a separate final judgment (as contemplated by Fed. R. Civ. P. 58).  *See, e.g.*, *Morris*, 39 F.3d at 1109; *Schuurman v. Motor Vessel "Betty KV,"* 798 F.2d 442, 445 (11th Cir. 1986); *Festa v. Local 3 Intern. Broth. of Elec. Workers*, 905 F.2d 35, 37 (2d Cir. 1990).  However, other courts dispute that such orders can ripen into final appealable judgments—at least under certain circumstances—without the entry of a final judgment pursuant to Fed. R. Civ. P. 58.  *See, e.g.*, *In re Litas Intern., Inc.*, 316 F.3d 113, 117–20 (2d Cir. 2003).  It is not necessary for me to engage with that dispute because in this case the administrative closing order has not ripened into a dismissal.[12]

Backmon's case is still pending before me.  The administrative closing order in this case was docketed on May 1 and read:

> This case has been reported settled.  Rather than keeping it open on the docket, the Clerk is directed to administratively close the file without prejudice to reopening within 30 days of this order.  If the parties wish to file a stipulation of dismissal (for approval by the court or simply for inclusion in the court's file), they may do so within 30 days of this order.  The dates set forth in this order may be extended for good cause pursuant to a motion filed in accordance with Local Rule 7.

Order, Doc. No. 125.  The 30-day period contemplated in the order thus would have expired on May 31.  On May 23, though, the parties made a consent motion to extend the time to move to re-open or file a stipulation of dismissal until June 14.  *See* Consent Mot. for Extension of Time, Doc. No. 126.  I granted that motion on May 24.  *See* Order, Doc. No. 128.  Also on May 23, Backmon filed a motion to re-open her case.  *See* Pl.'s Mot. to Reopen Case, Doc. No. 127.  On

---

[12] Even *were* the closing to have ripened into a final judgment, Backmon's *own* proposed draft settlement agreement includes a term that explicitly reserves to the district court jurisdiction over this matter "for the limited purpose of enforcing the terms of this Agreement."  *See* Pl.'s Am. Mem. in Opp'n, Doc. No. 149-1, at 3.

May 28, Backmon made a motion to amend her motion to re-open her case and included further exhibits and more detailed grievances. *See* Pl.'s Mot. to Amend/Correct Mot. to Reopen Case, Doc. No. 130. Both of those motions are still pending. On June 10, the parties held a telephonic status conference with Judge Fitzsimmons, and a new scheduling order regarding the draft settlement agreement was issued the following day. *See* Doc. Nos. 131, 132. All of the above occurred before June 14. There is no question that Backmon moved to re-open her case before the administrative closing order's conditional time-period passed. And there is no question that all parties understood that the case remained open.

The activity in this case after June 14 suggests exactly the same. Backmon has filed numerous motions since June 14, including two to amend her complaint. *See* Doc. Nos. 133 (fourth) and 147 (fifth). I entered three Orders in this matter between July 29 and November 4 that granted some motions and denied others. *See* Orders, Doc. Nos. 143, 146, 159. Two of Backmon's most recent motions—filed on November 9th and 22d—ask me to hold a hearing and to rule more quickly on her claims. *See* Pl.'s Mot. to Expedite Ruling, Doc. No. 160; Pl.'s Mot. for Hr'g, Doc. No. 165. Put simply, Backmon would like me to have subject-matter jurisdiction over everything in her case except the settlement agreement. But that is impossible: her case has either been dismissed or it has not. It has not.

    2. *There was mutual assent to clear and unambiguous terms.*

        i.   Mutual Assent

The April 29 Conference resulted in an enforceable oral contract to settle this case only if the parties mutually assented to clear and unambiguous terms there. *See Omega Eng'g*, 432 F.3d at 444. "The parties' intent is determined from the (1) language used, (2) circumstances

surrounding the transaction, including the motives of the parties, and (3) purposes which they sought to accomplish." *ValleCastro,* 2017 WL 2945717, at *3.

Nearly all signs point towards a meeting of the minds at the April 29 Conference. The Defendants, the court, Backmon's own lawyer, and, on some occasions, Backmon herself, seem to confirm that. Indeed, the only signs that do not align with that understanding are some of Backmon's own statements.

First, the Defendants aver that all parties assented in open court before Judge Fitzsimmons. *See* Defs.' Joint Mot., Doc. No. 136, at 6. The Defendants specifically explain that Judge Fitzsimmons "canvased" Backmon, "stated unambiguously that the matter was settled," and "[a]t no time did Plaintiff state that she refused to be bound by the agreement in the absence of a signed writing." *Id.* at 9.

Second, the court's understanding appears to have been the same as the Defendants'. When evaluating the enforceability of oral contracts, courts often note the importance of assent in open court, on the record. *See, e.g.*, *Doe v. Kogut*, 759 F. App'x 77, 81 (2d Cir. 2019); *Eureka Lodge No. 434*, 402 F.3d at 318; *Omega Eng'g*, 432 F.3d at 443; *Powell*, 497 F.3d at 131. Judge Fitzsimmons conducted the April 29 Conference in open court with all parties present. On April 30, the court made a minute entry on the docket that stated: "This matter is reported settled." Min. Entry, Doc. No. 124. And on May 1, the court made another docket entry ordering the case closed because "[t]his case has been reported settled." Order, Doc. No. 125. I have also seen Judge Fitzsimmons's notes from the April 29 Conference. Those notes are attached to this Order as Exhibit A (irrelevant personal information has been redacted). Judge Fitzsimmons's notes unequivocally indicate that a settlement of all essential terms was agreed that day. In addition, I have seen emails that Judge Fitzsimmons sent in response to emails from Backmon on

May 2 (Exhibit B) and June 20 (Exhibit C); they also state unequivocally that an agreement on all material terms was reached at the April 29 Conference.[13]  The extremely capable and experienced magistrate judge believed that a settlement had been agreed at the April 29 Conference.

Third, Kirschner—Backmon's own lawyer—acknowledged that there was mutual assent at the April 29 Conference.  Courts have looked to attorney representations when assessing the accuracy of oral settlement agreements subsequently reduced to writing.  *See Colapietro*, 2011 WL 3349842, at *3 (noting that an attorney "expressed no problem or concern over any aspect of the settlement agreement" and "[a]t no time . . . indicate[d] . . . any particular issue or problem that his client had with either the settlement agreement or the terms of the settlement documents").  Here, when Kirschner received a panicked email from Backmon on May 1, he emailed back to assure her that the case's closure was "standard [] procedure" for cases that have "achieved a settlement in princip[le]."  Pl.'s Mot. to Amend/Correct Mot. to Reopen Case, Doc. No. 130-2, at 1.  Thus, Kirschner believed that there was, in fact, a settlement in principle.  And, when Kirschner received the Defendants' draft settlement agreement on May 24, he wrote to Backmon: "I did read it; it seems pretty standard; there are a few wording changes I will propose to you next week (as well as addressing the language you want added relating to damages)."  Pl.'s Am. Mem. in Opp'n, Doc. No. 149-1, at 1.  Kirschner's matter-of-fact reaction indicates that the Defendants' draft settlement agreement did, in fact, accurately portray the agreed-to deal.

---

[13] I take judicial notice of the contents of Judge Fitzsimmons's conference notes and the emails between her and Backmon.  Courts may take judicial notice of facts "not subject to reasonable dispute" either because they are generally known in the relevant community or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  The contents of Judge Fitzsimmons's notes and the emails between her and Backmon come from sources whose accuracy cannot reasonably be questioned.

Fourth, some of Backmon's own words indicate mutual assent at the April 29 Conference. Because there is no transcript of the April 29 Conference, Backmon's words come from her submissions and from emails she has sent to the court. Courts may treat parties' email representations to the court as bearing significant weight. *See, e.g.*, *Hull*, 2012 WL 12883961, at *1 (enforcing a settlement agreement when evidence of the agreement was submitted to the court via email). Importantly, on May 2, Backmon emailed the court and Kirschner and explained: "I would like an agreement drafted, specific to what was agreed to during the settlement and nothing more." Pl.'s Mem. in Opp'n, Doc. No. 138-1, at 2. Thus, Backmon acknowledged that she "agreed to" terms at the April 29 Conference. Later, too, Backmon seemed to acknowledge that the parties had agreed to terms at the April 29 Conference. Backmon wrote in her amended motion to re-calendar: "[T]he situation has unexpectedly and drastically changed such that it is no longer fair or appropriate to enforce the agreement written." Pl.'s Mot. to Amend/Correct Mot. to Reopen Case, Doc. No. 130, at ¶ 1. Backmon's assertion acknowledges that there had been an agreement that—at one point, in her view—would have been fair to enforce.

### ii. Clear and Unambiguous Terms

Even though there was mutual assent to some complete set of material terms at the April 29 Conference, the question remains whether those terms were clear and unambiguous. Again, nearly all signs point to the conclusion that they were.

The Defendants believe that the terms were clear and unambiguous. They claim that "there is absolutely no ambiguity in what the parties agreed to with respect to a full and final settlement of this matter." Defs.' Joint Mot., Doc. No. 136, at 5. Further, they claim that their draft settlement agreement reflects those agreed-upon terms. *See* Pl.'s Am. Mem. in Opp'n, Doc. No. 149-1, at 2–9.

The court also believed that the terms were clear and unambiguous.  I have seen Judge

Fitzsimmons's notes from the April 29 conference.  *See* Ex. A.  Although the material terms of

the deal are not laid out there neatly, Judge Fitzsimmons noted numerous clear and unambiguous

terms to which the parties agreed.  Judge Fitzsimmons's notes corroborate some of the

Defendants' claims and directly contradict many of Backmon's claims.

Kirschner—Backmon's own attorney—seemed to believe that the Defendants' draft

settlement agreement represented the clear and unambiguous terms agreed upon at the April 29

Conference.  Recall that some courts consider attorney representations when assessing the

accuracy of oral settlement agreements subsequently reduced to writing.  *See Colapietro*, 2011

WL 3349842, at *3.  When Kirschner received the Defendants' draft settlement agreement on

May 24, he wrote to Backmon: "I did read it; it seems pretty standard; there are a few wording

changes I will propose to you next week (as well as addressing the language you want added

relating to damages)."  Pl.'s Am. Mem. in Opp'n, Doc. No. 149-1, at 1.  Kirschner's (lack of)

reaction indicates that all the clear and unambiguous material terms of the deal were contained in

the Defendants' draft settlement agreement.

Backmon herself now claims that there were no clear and unambiguous terms agreed at

the April 29 Conference and that the two sides merely went back and forth with "discuss[ion]"

and "counter offers."  Pl.'s Mem. in Opp'n, Doc. No. 138, at 7–8.  But, as described above,

Backmon at first seemed to acknowledge that the parties had agreed to terms at the April 29

Conference: Backmon's email to the court on May 2 explained that she "would like an

agreement drafted, specific to what was agreed to during the settlement and nothing more."  Pl.'s

Mem. in Opp'n, Doc. No. 138-1, at 2.  Such a draft agreement would be possible only if what

was agreed had been clear and unambiguous.

In addition, Backmon's early complaints did not regard the *terms* that had been agreed at the April 29 Conference, but rather the *process* by which the agreement would be formalized. For instance, on May 1, Backmon emailed the court and Kirschner and focused on the oral nature of the April 29 agreement: "Why are they closing my case before an agreement has physically been signed? It's all verbal nothing is signed, I did not, nor do I agree to my case being closed before a signed agreement is in place." Pl.'s Mem. in Opp'n, Doc. No. 138-1, at 5. Some of Backmon's other early concerns centered on who would physically draft the settlement agreement. On May 2, Backmon emailed both the court and Kirschner saying: "I did not agree to, nor did I understand that the Defendants, my adversaries, would be typing up my settlement agreement. That's unacceptable! I would like Mr. Kirschner, my attorney to write it, not my adversaries, the Defendants." *Id.* at 7. Backmon was also concerned with the deadline for receiving the draft agreement from the Defendants. *Id.* at 2. Indeed, in Backmon's motion to re-open her case, she cited the Defendants' failure to "timely submit the Settlement Agreement to the Plaintiff and Pro Bono Counsel." Pl.'s Mot. to Reopen Case, Doc. No. 127, at ¶¶ 5–6. Those complaints did not indicate that the material terms of the agreement were unclear or unambiguous; rather, they indicated Backmon's desire to retain flexibility and her worry that the terms might change.

Backmon's complaints also seem to concede that the Defendants' draft settlement agreement accurately formalizes the clear and unambiguous terms agreed upon at the April 29 Conference. For instance, when Backmon sent to the Defendants and the court her return draft settlement agreement, she did not explain her changes by saying that she thought different terms had been agreed; rather, Backmon explained that her edits "address[] my concerns" and "express that I do not intend to be bound unless and until a formal agreement is memorialized and

executed." Pl.'s Am. Mem. in Opp'n, Doc. No. 149-1, at 10. Backmon merely changed the terms and, essentially, attempted to withdraw her assent.

In short, it seems as though the Defendants' draft settlement agreement includes the agreed-upon terms from the April 29 Conference and that Backmon has merely had a change of heart. But an oral settlement agreement to clear and unambiguous terms "remains binding even if a party has a change of heart between the time he agreed to the settlement and the time those terms are reduced to writing." *Powell*, 497 F.3d at 129; *see also Hull*, 2012 WL 12883961, at *2–3. I conclude that the terms contained in the Defendants' draft settlement agreement—Pl.'s Am. Mem. in Opp'n, Doc. No. 149-1, at 2–9—set out the material terms agreed at the April 29 Conference. That settlement agreement should be enforced.

## III.    Conclusion

For the above reasons, the Defendants' Joint Motion to Enforce the Settlement Agreement, Doc. No. 136, is **GRANTED**. Backmon's motion to dismiss for lack of jurisdiction the Defendants' joint motion to enforce the settlement agreement, Doc. No. 157, is **DENIED**. Backmon's other pending motions—Mot. for Temporary Restraining Order, Doc. No. 105;[14] Pl.'s Mot. to Reopen Case, Doc. No. 127; Pl.'s Mot. to Amend/Correct Mot. to Reopen Case, Doc. No. 130; Mot. to Amend/Correct Am. Compl., Doc. No. 133; Mot. to Amend/Correct Am. Compl., Doc. No. 147; Mot. to Appoint Counsel, Doc. No. 148; Mot. to Lift/Terminate Stay of Pleadings and Discovery, Doc. No. 150; Mot. for Rule 26(f) Conf., Doc. No. 151; Am. Mot. to Appoint Counsel, Doc. No. 152; Mot. for Attorney Withdrawal and to Appoint Counsel, Doc. No. 156; Mot. to Rule on All Pending Mot., Doc. No. 158; Mot. to Expedite Ruling, Doc. No.

---

[14] Doc. No. 105 was styled as an "ex parte" motion, but Backmon filed it on the docket and has included it in several other filings. *See, e.g.*, Doc. Nos. 130, 153, 160.

160; Pl.'s Mot. for Hr'g, Doc. No. 165; Pl.'s Mot. for Hr'g, Doc. No. 169—are **DENIED** as

moot. The Defendants' Joint Motion for an Extension of Time, Doc. No. 161, is also **DENIED**

as moot.


     So ordered.

Dated at Bridgeport, Connecticut, this 21st day of January 2020.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge
